Haley K. Krug (ISB No. 10442)
hkrug@kmclaw.com
**KIRTON McCONKIE**
1100 W. Idaho St., Ste. 930
Boise, ID 83702
Telephone: (208) 370-3325
Facsimile:  (208) 370-3324

Kathleen Pakenham *(pro hac vice forthcoming)*
kpakenham@velaw.com
Stephen Josey *(pro hac vice forthcoming)*
sjosey@velaw.com
Vinson & Elkins
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Telephone: +1(212) 237-0000
Facsimile:  +1(212) 237-0100

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STANLEY D. CROW, an individual, and S.CROW COLLATERAL CORP., an Idaho corporation, | Case No.: |
| Plaintiffs, | **COMPLAINT** |
| vs. | |
| UNITED STATES OF AMERICA, by and through its agency the UNITED STATES DEPARTMENT OF THE TREASURY and its bureau the INTERNAL REVENUE SERVICE, | |
| Defendant. | |

COME NOW the above-named Plaintiffs and for claims for relief against the Defendant complain and allege as follows:

COMPLAINT - 1

## PRELIMINARY STATEMENT

1.      This case is about whether the United States Department of the Treasury ("Treasury") and the Internal Revenue Service ("IRS") can promulgate regulations that purport to substitute administrative agency preference for clear Congressional intent.

2.      Resolution of these issues is timely and important.  Plaintiffs are directly impacted by the unlawful regulation that is at the heart of this case.  Plaintiff S.Crow Collateral Corp. ("SCCC") is a dealer in capital assets ("property").  Plaintiff Stanley D. Crow is president and a director of SCCC.  SCCC buys properties by issuing installment obligations to sellers.  Those installment obligations mature in later tax years.  The United States Department of the Treasury ("Treasury") and the Internal Revenue Service ("IRS") do not like these transactions even though they are expressly permitted by statute, because they allow sellers to utilize the "installment method," 26 U.S.C. (the "Code" or "I.R.C.")[1] § 453, which defers tax on the gain on sales to later tax years.

3.      Notwithstanding Congress's clear intent that sellers take advantage of the tax deferral inherent in the "installment method," which is the required treatment for "installment sales," Treasury and the IRS have decided to attack the propriety of so-called Monetized Installment Sale transactions ("MIS Transactions"), in which a seller exchanges property for an installment obligation and then borrows money from an unrelated party to achieve liquidity.

4.      After a years-long public relations campaign aimed at dissuading taxpayers from entering into so-called MIS Transactions and smearing businesses such as SCCC as "promoters" of tax "scams," the Treasury and the IRS published a notice in the Federal Register recognizing its intent to identify "MIS Transactions" as "listed transactions" for purposes of 26

---

[1] References to "Section" in this Complaint are to sections of the Code, unless otherwise stated.

U.S.C. § 6011 (the "Notice").  88 Fed. Reg. 51756 (Aug. 4, 2023) (and attached as <u>Exhibit A</u>).  A "listed transaction" is a "transaction specifically identified by the Secretary [of the Treasury] as a tax avoidance transaction."  I.R.C. § 6707A(c)(2).

5.     While the Notice is stylized as one of "proposed rulemaking" – a departure from the Treasury and IRS's traditional method of designating "listed transactions" by subregulatory guidance – there is nothing "proposed" about the government's final and cumulative policy position that MIS Transactions are "scams," that the transactions run afoul of the Code, and that sellers should not account for these transactions under the "installment method."  The IRS's persistent vocalization of its policy regarding so-called MIS Transactions has aggrieved Plaintiffs by spooking potential counterparties looking to sell their properties legally for installment obligations, causing Plaintiffs to lose business that cannot be restored until a court rightfully determines that the IRS's widely disseminated pronouncements regarding so-called MIS Transactions are not in accordance with the law.

## <u>NATURE OF ACTION</u>

6.     Plaintiffs bring this suit pursuant to the Administrative Procedure Act ("APA"), specifically 5 U.S.C. §§ 702 and 706(2), seeking injunctive, declaratory, and other relief through a court order that holds unlawful and sets aside, or grants relief to Plaintiffs from, the Treasury's and IRS's Notice and recognizes that its intent to identify so-called MIS Transactions as "listed transactions" for purposes of 26 U.S.C. § 6011 is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to a constitutional right, power, privilege or immunity; and (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

7.     Plaintiffs also seek a court order pursuant to 5 U.S.C. §§ 702 and 706(2) that holds unlawful and sets aside, generally or as to Plaintiffs, the Treasury Regulations published at

26 C.F.R. §§ 1.6011-4(e)(2)(i), 301.6111-3(b)(4)(iii), and 301.6111-3(e) (collectively, the "Retroactive Reporting Regulations") that require "listed transaction" participants and "material advisors" (as that term is defined in 26 U.S.C. § 6111) to file disclosures for tax periods that ended before a transaction becomes "listed." The Retroactive Reporting Regulations should be set aside and held unlawful because, working in tandem with the Notice and Treasury's procedures for identifying "listed transactions," they are impermissibly retroactive.

8.      In promulgating 26 U.S.C. §§ 6011 and 6111, the statutes under which the Retroactive Reporting Regulations were issued, Congress did not in "express terms" provide the Treasury with the power to issue retroactive rules. *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988); *see also Bowen*, 488 U.S. at 220 (J. Scalia, concurring) ("Quite simply, a rule is an agency statement 'of future effect,' not 'of future effect and/or reasonable past effect'"); 5 U.S.C. § 551(4) (Rule is defined as "an agency statement of general or particular applicability and *future effect*") (emphasis added). Moreover, the challenged regulations violate 26 U.S.C. § 7805(b), which prohibits the Treasury from issuing regulations that "apply to any taxable period ending before … [t]he date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public."

9.      Alternatively, Plaintiffs bring this suit pursuant to 28 U.S.C. § 2201 for a court order declaring that they are not required to file disclosures relating to their participation in, or purported status as "material advisors" for, MIS Transactions for any tax periods that ended before the issuance of the Notice. As noted above, 26 U.S.C. § 7805(b) prohibits Treasury from issuing regulations (proposed, final, or temporary) with retroactive effect (subject to certain exceptions that are not at issue here).

10.     Moreover, as discussed above, the Notice, working in tandem with the Retroactive Reporting Regulations, creates a reporting regime that impermissibly looks backward to impose disclosure requirements on "participants" and "material advisors" for tax years preceding the Notice.  Disclosure requirements for "listed transaction" participants and "material advisors" are onerous.  Treasury regulations provide only a short time period after a transaction is designated as "listed" for prior-period disclosures to be filed with the IRS's Office of Tax Shelter Analysis ("OTSA").  Accordingly, Plaintiffs are currently suffering the practical effects of needing to review their files, organize information, and prepare to report transactions from tax years that preceded the Notice.

11.     Because the regulatory scheme that imposes reporting requirements for tax years preceding a transaction's designation as "listed" is not in accordance with the law, Plaintiffs presently are entitled to declaratory relief so that they do not continue to sustain additional legal injury.

12.     Alternatively, Plaintiffs bring this suit pursuant to 5 U.S.C. §§ 702 and 706(1) and 28 U.S.C. § 1361 for an order prohibiting the Treasury and the IRS from promulgating a final regulation identifying whether MIS Transactions are "listed transactions" for purposes of 26 U.S.C. § 6011 until after Treasury issues — and the order should mandate that Treasury issue — final regulations pursuant to 26 U.S.C. § 453A(e) that identify when taxpayers are permitted to use the installment method of tax accounting, as codified under 26 U.S.C. §§ 453 and 453A, notwithstanding that an "intermediary" – a term undefined in 26 U.S.C.§ 453A(e) – is a party to the installment sale transaction.

13.     Plaintiffs do not seek an order determining the tax treatment of Plaintiffs, or of sellers to SCCC, or of buyers from SCCC, or of any other party or person.  This action only seeks

relief concerning the Treasury and the IRS's regulations, practices, and procedures regarding filing requirements relating to "listed transactions."  *See CIC Services, LLC v. Internal Revenue Service*, 593 U.S. 209 (2021).

## PARTIES AND JURISDICTION

14.    This Court has jurisdiction over this action to pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1346(a)(2), 28 U.S.C. § 1361, 28 U.S.C. § 2201, and 5 U.S.C. § 702.

15.    Venue is proper pursuant to 28 U.S.C. § 1391(e).

16.    Plaintiff Stanley D. Crow ("Crow") is an individual who resides in Boise, Idaho.

17.    Plaintiff S.Crow Collateral Corp. ("SCCC") is an Idaho corporation with its principal place of business located in Boise, Idaho.

18.    Defendant is the United States of America, acting through one of its administrative agencies, the United States Department of the Treasury ("Treasury"), and a bureau of the Treasury, the Internal Revenue Service ("IRS").

## GENERAL ALLEGATIONS

The general factual and legal allegations giving rise to the causes of action in this matter are asserted as follows:

### *SCCC's General Business Dealings*

19.    At all material times, Plaintiff SCCC has engaged in the established business of being a qualified intermediary.  *See* 26 CFR § 1.1031(k)-1; 26 CFR § 15a.453-1(b)(3)(i); 26 CFR § 1.1031(k)-1 ("Qualified Intermediary Regulations").  As a qualified intermediary, SCCC acts as an installment purchaser of capital assets from unrelated parties, which it then resells.  The Notice and the proposed regulation therein do not purport to amend the Qualified Intermediary Regulations.

COMPLAINT - 6

20.     SCCC undertakes full-recourse liability to the installment seller for payment of the entire purchase price, with interest.

21.     Since the adoption of Section 202(f) in the Revenue Act of 1921, the internal revenue laws of the United States have authorized (and under the current 26 U.S.C. § 453 require, absent the seller's election otherwise) an installment seller to use the installment method to report the gain from an installment sale, without regard to whether the unrelated installment purchaser purchases for resale; retains the property for any period of time; enters into use, possession, or title of or to the property; resells immediately or later; or does any of the above pursuant to previous, simultaneous, or later agreement, and without regard to whether the installment seller knows whether the installment purchaser is a dealer or purchases for resale.

22.     It is a commonplace business practice of dealers such as, but not limited to, SCCC, to seek to arrange to re-sell an asset immediately upon the dealer's later acquisition of the asset.

23.     Under 26 U.S.C. § 453(c) and its predecessors for more than a century, the taxpayer-seller is under no obligation to identify or favor a cash buyer over an installment buyer.

24.     In a typical transaction for SCCC, a property owner (the "seller") has either identified a buyer (the "subsequent buyer") and has entered into a contract ("purchase agreement") to sell the property to the subsequent buyer, or seeks to sell the property for an installment obligation from the outset.

25.     Either before or after the purchase agreement between the seller and the subsequent buyer is executed, SCCC, acting as a counterparty, enters into a separate agreement ("installment agreement") with the seller to purchase the property from the seller in exchange for

an interest-bearing installment obligation.  Under the installment agreement, SCCC assumes the seller's rights and responsibilities to the subsequent buyer under the purchase agreement.

26.     The installment agreement between the seller and SCCC causes SCCC to obtain equitable title to the subject property.  Once SCCC obtains equitable title to the property, it then sells the property to the subsequent buyer under the terms of the purchase agreement and takes possession of the funds paid by the subsequent buyer.

27.     Sellers may borrow money with a third-party lender in order to achieve liquidity for the seller's business or investment purposes.  These loans are not secured by SCCC's installment obligations, and the installment agreements explicitly prohibit the seller from pledging the installment obligation or any interest therein as collateral or for any reason.  Indeed, under the installment agreement, any such pledge or security interest is void from the beginning and has no force or effect.  In all transactions, the seller, SCCC, and the lender are unrelated.

28.     SCCC pays the interest it owes to the seller under the installment agreement into an installment escrow account maintained for the benefit of the seller.  At that point, the money is owned by the seller, and SCCC has no further connection with it.  If the seller then arranges for that money to be transferred elsewhere to be paid to the third-party lender, that is between them. If the seller and the third-party lender enter into an agreement whereby the seller transfers to the third-party lender money which the seller received in the installment escrow, then that money is used by the seller to apply to the seller's monthly interest payments that the seller owes on the loan issued by the third-party lender.  The third-party lender has no security interest in or lien on the installment obligation and cannot collect against it.

29.     The seller may report the sale of the property using the "installment method" as prescribed by 26 U.S.C. § 453 (discussed in additional detail below).  Alternatively, the seller can

elect out of using the "installment method," and use another method of accounting permitted under the Code.  For example, the seller could instead choose to declare receipt of the installment obligation and then calculate its capital gain or loss under the rules promulgated under 26 U.S.C. § 1001 and 26 C.F.R. § 1.1001-1(g).

30.     Plaintiffs do not provide tax advice to sellers, are not involved in the preparation of sellers' federal income tax returns, and have no input into or knowledge of how sellers report transactions for federal tax purposes.

### *Statutory and Regulatory Framework for Installment Sales*

31.     In a cash sale or disposition of a property, a seller accounts for the transaction based on rules codified under 26 U.S.C. § 1001, by recognizing "the excess of the amount realized thereof from the adjusted basis for determining gain, and the loss shall be the excess of adjusted basis."  For purposes of Section 1001 of the Code, the "amount realized" from the sale "shall be the sum of any money received plus the fair market value of the property (other than money) received" by the seller.  26 U.S.C. § 1001(b).

32.     However, when a seller receives an installment obligation (that provides for payments in a later tax year) instead of cash in exchange for the property, the seller is permitted to defer recognition of income beyond the year of the property's disposition under the "installment method."  There are certain exceptions to these rules, which are not applicable to this matter.

33.     Under 26 U.S.C. § 453, a seller qualifies to use the "installment method" when it disposes of property in an "installment sale," which is defined in the Code as a sale "where at least [one] payment is to be received after the close of the taxable year in which the disposition occurs."  26 U.S.C. § 453(b)(1).

34.     When a transaction meets the definition of an "installment sale," the "installment method" becomes the default method of tax accounting by which the seller accounts

for the gain or loss on that sale.  26 C.F.R. § 15a.453-1(d).  However, the seller may make an affirmative election to opt out of using the "installment method" pursuant to 26 U.S.C. § 453(d) and instead choose to account for the gain or loss on the transaction under 26 U.S.C. § 1001.

35.     In 1987, Congress amended 26 U.S.C. § 453A.  Included in that amended provision are rules stating that "if any indebtedness… is secured by an installment obligation to which this section applies, the net proceeds of the secured indebtedness shall be treated as a payment received on such installment obligation as of the later of – (A) the time the indebtedness becomes secured indebtedness, or (B) the time the proceeds of such indebtedness are received by the taxpayer." 26 U.S.C. § 453A (d)(1).  This rule is colloquially known as the "Pledge Rule."

36.     Section 453A explains that for purposes of the Pledge Rule, "indebtedness is secured by an installment obligation to the extent that payment of principal or interest of such indebtedness is *directly* secured (under the terms of the indebtedness or any underlying arrangements) by an interest in such installment obligation."  26 U.S.C. § 453A(d)(4) (Emphasis added).  The statute further states that a "payment shall be treated as directly secured by an interest in an installment obligation to the extent an arrangement allows the taxpayer to satisfy all or a portion of the indebtedness with the installment obligation." *Id*.

37.     In 1988, Congress amended 26 U.S.C. § 453A to add subsection (e), which states that the "Secretary *shall* prescribe such regulations as may be necessary to carry out the purposes of this section, including regulations – (1) disallowing the use of the installment method in whole or in part for transactions in which the rules of this section otherwise would be avoided through the use of related persons, pass-thru entities, or intermediaries."  (Emphasis added).

COMPLAINT - 10

38.     To date, notwithstanding that 26 U.S.C. § 453A(e) was enacted more than 35 years ago, Treasury has not released the regulations that Congress instructed it to issue under color of that statute.

39.     There are no regulations that preclude a seller's use of the "installment method" when an "intermediary" is involved in a transaction.  In fact, Treasury Regulations and 26 U.S.C. § 453 explicitly permit sellers to use the "installment method" to report transactions that involve intermediaries, including in the context of a "like-kind exchange."  *See* 26 C.F.R. § 1.1031(k)-1(j)(2)(ii) and 26 C.F.R. § 15a.453-1(b)(3)(i).

40.     SCCC's installment-purchase transactions comply with the black-letter law of 26 U.S.C. §§ 453 and 453A, and sellers are entitled to report the transactions using the "installment method" of accounting.  Sellers receive legally enforceable installment obligations that require SCCC to pay the principal in future tax years and monthly interest payments until the principal is paid.  Any loans that sellers take out in the interim are not directly or indirectly secured by SCCC's installment obligation, and the Pledge Rule is not implicated.

*Background on IRS Notices Identifying MIS Transactions as*
*"Problematic," "Inappropriate," Improper," and "Potentially Abusive"*

41.     In May 2021, the IRS publicly released Chief Counsel Advice ("CCA") Memorandum No. 202118016, which was dated October 31, 2019.  The CCA Memorandum noted that IRS Chief Counsel was prompted to issue his views "regarding 'Monetized Installment Sale' transactions."

42.     The CCA Memorandum stated that "there do seem to be common features that make the transactions problematic.  And we generally agree that the theory on which promoters base the arrangements is flawed."  The CCA Memorandum does not define what constitutes an "MIS Transaction."

COMPLAINT - 11

43.     In July 2021, the IRS published a press release noting that it was wrapping up "its 2021 'Dirty Dozen' scams list with warning about promoted abusive arrangements." One of the arrangements identified in that press release was "[i]mproper monetized installment sales."

44.     The above-identified press release explained that so-called MIS Transactions "occur when an intermediary purchases appreciated property from a seller in exchange for an installment note, which typically provides for payments of interest only, with principal being paid at the end of the term. In these arrangements, the seller gets the lion's share of the proceeds but improperly delays the gain recognition on the appreciated property until the final payment on the installment note, often slated for many years later."

45.     The above-identified press release did not explain why gain recognition is "improperly delay[ed]" under the above-described arrangements; it simply labeled MIS Transactions as creating "improper" tax consequences without further justification. The press release also did not explain how the "seller gets the lion's share of the [sales] proceeds," given that the installment note's principal is "paid at the end of the term" of the installment note.

46.     In June 2022, the IRS published another press release titled "IRS warns taxpayers of 'Dirty Dozen' tax scams for 2022." That press release identifies MIS Transactions as a "scam".

47.     The 2022 press release stated that MIS Transactions "involve the inappropriate use of the installment sale rules under section 453 by a seller who, in the year of sale of property, effectively receives the sales proceeds through purported loans." The 2022 press release was the IRS's first public mention of the use of loans in the transactions. Like the 2021 press release, the 2022 press release did not provide any statutory, regulatory, or legal authority explaining why "so-called" MIS Transactions "involve inappropriate use of installment sale rules."

48.     In March 2023, the IRS published another press release titled "Dirty Dozen: Watch out for schemes aimed at high-income filers; … monetized installment sales carry risk."

49.     The 2023 press release labeled "so-called" MIS Transactions as "*potentially abusive.*" (Emphasis added).   The press release described "so-called" MIS Transactions as involving "promoters" who "find taxpayers seeking to defer the recognition of gain upon the sale of appreciated property."   The press release explained that under "so-called" MIS Transactions, "an intermediary purchases appreciated property from a seller in exchange for an installment note" and that "the seller gets the lion's share of the proceeds, but improperly delays the recognition of gain on the appreciated property."

50.     The 2023 press release did not explain how the "seller gets the lion's share of the proceeds," did not mention the seller borrowing money to achieve liquidity after receiving an installment note (and requiring the seller to pay periodic interest on those loans), and did not otherwise provide any statutory, regulatory, or legal authority explaining why a so-called MIS Transaction "improperly delays" gain recognition.

51.     In April 2024, after publication of the Notice (described in detail below), the IRS published yet another press release titled "Dirty Dozen: High-income filers vulnerable to illegal tax schemes face risk from … monetized installment sales."

52.     The April 2024 press release described MIS Transactions as "frequently shady deals" that "improperly delays the gain recognition on the appreciated property until the final payment on the installment note, often slated for many years later."  Like most of the IRS's public pronouncements regarding MIS Transactions, the 2024 press release makes no mention that sellers achieve liquidity by borrowing money.

53.     The clear purpose of these "Dirty Dozen" press releases is to chill taxpayer participation in the transactions that the IRS identified as "scams."

54.     Moreover, in furtherance of its campaign against so-called MIS Transactions, in a Tax Court matter where the merits of these transactions are being litigated by sellers and the IRS, the IRS has described Plaintiffs (who are not parties to that Tax Court matter) as "promoting" MIS Transactions.  The IRS further stated that the litigated transaction is the subject of a "promoter investigation."  A separate proceeding concerning violations of Plaintiffs' confidentiality rights in that Tax Court proceeding is now pending in this Court.  *Crow v. United States*, Case No.: 1:23-cv-00046.

55.     While the term "promoter investigation" is not defined in the IRS's Tax Court pleadings, it is widely understood to reference an IRS examination into an individual or entity for Section 6700 penalties for "[p]romoting abusive tax shelters, etc."

56.     The IRS has never assessed or even proposed a Section 6700 penalty against Plaintiffs.

57.     The clear purpose of these statements by the IRS is to taint the Tax Court's perception of the MIS Transactions by painting them as "abusive tax shelters," notwithstanding that, to Plaintiffs' knowledge, no court has ruled that MIS Transactions are incompatible with the Code and associated Treasury regulations.

*IRS Issuance of Notice Titled "Identification of*
*Monetized Installment Sale Transactions as Listed Transactions"*

58.     In an escalation of its rhetoric around MIS Transactions, on August 4, 2023, Treasury and IRS published the Notice under the title "Identification of Monetized Installment Sale Transactions as Listed Transactions."

COMPLAINT - 14

59.     The government's decision to issue the Notice as one of "proposed rulemaking" was a novel approach to designating a "listed transaction."  To date, the IRS has identified most "listed transactions" through published notices or subregulatory guidance that took immediate effect.  Indeed, in a document titled "Announcement 2023-11" Treasury and the IRS stated that it was their position that "listed transactions can be identified by notice or other subregulatory guidance because Congress, in enacting the American Jobs Creation Act of 2004, exempted the identification of such transactions from the APA's notice-and-comment procedures."

60.     Under Section 6707A(c)(2) a "listed transaction" is a "reportable transaction which is the same as, or substantially similar to, a transaction specifically identified by the Secretary [of the Treasury] as a tax avoidance transaction for purposes of section 6011."

61.     Treasury regulations promulgated under 26 C.F.R. § 1.6011-4 state that "every taxpayer that has participated" in a "listed transaction" "and who is required to file a tax return must file … a disclosure statement."  That regulation explains that the disclosure must be made on an IRS Form 8886, "Reportable Transaction Disclosure Statement."  The Form 8886 is required to be "attached to the taxpayer's tax return for each taxable year for which a taxpayer participates in a reportable transaction."  Moreover, a "copy of the disclosure statement must be sent to OTSA at the same time that any disclosure statement is first filed by the taxpayer pertaining to a particular reportable transaction."

62.     Treasury regulations also state that if a transaction becomes a "listed transaction … after the filing of the taxpayer's tax return (including an amended return) reflecting the taxpayer's participation in the listed transaction … and before the end of the period of limitations for assessment of tax for any taxable year in which the taxpayer participated in the listed

transaction …, then a disclosure statement must be filed … with OTSA within 90 calendar days after the date on which the transaction became a listed transaction." 26 C.F.R. § 1.6011-4(e)(2)(i).

63.     In the instructions to Form 8886, the IRS estimates that completion of each form will take 21 hours and 31 minutes between "recordkeeping," "[l]earning about the law or the form," and "[p]reparing, copying, assembling, and sending the form to the IRS."

64.     Section 6707A(b) imposes significant monetary penalties for failing to comply with the "participant" reporting requirements for "listed transactions."  Willful failure to comply with IRS reporting requirements also can lead to criminal penalty under 26 U.S.C. § 7203.

65.     The Code also requires "material advisors" of "listed transactions" to "make a return" "identifying and describing the transaction" and "describing any potential tax benefits expected to result from the transaction."  Section 6111(b)(1) defines a "material advisor" as any person "who provides any material aid, assistance, or advice with respect to organizing, managing, promoting, selling, implementing, insuring, or carrying out any reportable transaction," and who derives sufficient gross income from such "aid, assistance, or advice."

66.     Under 26 C.F.R. § 301.6111-3, "material advisors" are required to file an IRS Form 8918, "Material Advisor Disclosure Statement" with the OTSA "by the last day of the month that follows the end of the calendar quarter in which the advisor became a material advisor with respect to the reportable transaction."

67.     In the instructions to Form 8918, the IRS estimates that completion of each form will take 14 hours and 31 minutes between "recordkeeping," "[l]earning about the law or the form," and "[p]reparing, copying, assembling, and sending the form to the IRS."

68.     Moreover, pursuant to 26 U.S.C. § 6112, "material advisors" must keep lists "identifying each person with respect to whom such advisor acted as a material advisor with

respect to such transaction" and other information as the Treasury may require by regulation. Section 6708 prescribes a monetary penalty regime for any "material advisor" who "fails to make such list available upon written request to the Secretary [of the Treasury] … within 20 business days after the date of such request."

69.    Under 26 U.S.C. § 6707, "material advisors" are subject to substantial monetary penalties if they fail to file a return or file a return with "incomplete information" with respect to a "listed transaction."  A "material advisor's" willful failure to comply with IRS reporting requirements can also lead to criminal penalty under 26 U.S.C. § 7203.

*Description of the Notice*

70.    The Notice includes "proposed regulations that would identify monetized installment sale transactions and substantially similar transactions as listed transactions."  The Notice explains that "[m]aterial advisors and participants in these listed transactions would be required to file disclosures with the IRS and would be subject to penalties for failure to disclose."

71.    The Notice includes the text of self-styled "proposed" regulations and explains that so-called MIS Transactions and transactions that are "substantially similar" will be designated a "listed transaction for purposes of § 1.6011-4(b)(2) and sections 6111 and 6112."

72.    The Notice initially provides the following seven elements to define and identify so-called MIS Transactions:

(1) "A taxpayer (seller), or a person acting on the seller's behalf, identifies a potential buyer for appreciated property (gain property), who is willing to purchase the gain property for cash or other property (buyer cash)."

(2) "The seller enters into an agreement to sell the gain property to a person other than the buyer (intermediary) in exchange for an installment obligation."

COMPLAINT - 17

(3) "The seller purportedly transfers the gain property to the intermediary, although the intermediary either never takes title to the gain property or takes title only briefly before transferring it to the buyer."

(4) "The intermediary purportedly transfers the gain property to the buyer in a sale of the gain property in exchange for the buyer cash."

(5) "The seller obtains a loan, the terms of which are such that the amount of the intermediary's purported interest payments on the installment obligation correspond to the amount of the seller's purported interest payments on the loan during the period.  On each of the installment obligation and loan, only interest is due over identical periods, with balloon payments of all or a substantial portion of principal due at or near the end of the instruments' term."

(6) "The sales proceeds from the buyer received by the intermediary, reduced by certain fees (including an amount set aside to fund purported interest payments on the purported installment obligation) are provided to the purported lender to fund the purported loan to the seller or transferred to an escrow or investment account of which the purported lender is a beneficiary.  The lender agrees to repay these amounts to the intermediary over the course of the term of the installment obligation."

(7) "On the seller's Federal income tax return for the taxable year of the purported installment sale, the seller treats the purported installment sale as an installment sale under section 453."

73.     After describing these elements, the Notice states that a "transaction may be 'substantially similar' if such transaction does not include all of the elements described above."

74.     The Notice does not explain which, if any, of the elements described in the Notice must be satisfied for a transaction to be "substantially similar" to a so-called MIS Transaction.

75.     To illustrate the point that not all elements described in the Notice must be satisfied for a transaction to be deemed "substantially similar" to a so-called MIS Transaction, and thus subject to the "listed transaction" reporting and penalty regime, the Notice states that "[f]or example, a transaction would be substantially similar to a monetized installment sale if a seller transfers property to an intermediary for an installment obligation, the intermediary simultaneously or after a brief period transfers the property to a previously identified buyer for cash or other property, and in connection with the transaction, the seller receives a loan for which the cash or property from the buyer serves indirectly as collateral."

76.     The Notice provides various justifications for why Treasury and the IRS decided to designate MIS and substantially similar transactions as "listed transactions."  These include:

(a) That the intermediary is not a bona fide purchaser of the property because the intermediary's participation in the transaction "serves no purpose other than Federal income tax avoidance, and the intermediary neither enjoys the benefits nor bears the burdens of ownership of the gain property."

(b) That the "seller is appropriately treated as having already received the full payment at the time of the sale to the buyer because (1) the purported installment obligation received by the seller is treated as the receipt of a payment by the seller under [26 C.F.R.] § 15a.453-1(b)(3) since it is indirectly secured by the sales proceeds, or (2) the proceeds of the purported loan are appropriately treated as a payment to the

seller because the purported loan is not a bona fide loan for Federal income tax purposes, or (3) the pledging rule of section 453A(d) deems the seller to receive full payment on the purported obligation in the year the seller receives the loan proceeds."

(c) That MIS Transactions "may be disregarded or recharacterized under the economic substance rules codified under section 7701(o) or the substance over form doctrine" or that the "step doctrine and conduit theory may apply to recharacterize" the transactions.[2]

77.    The Notice states that "participants" required to report such transactions would "include the seller, the intermediary, the purported lender, and any other person whose Federal income tax return reflects tax consequences or the strategy described" in the Notice. The regulation is invalid for multiple reasons, as set forth below.

*The Notice Warps the Meaning and Purpose of the Pledge Rule*

78.    While the Notice provides a number of supposed elements to define what constitutes a so-called MIS Transaction, it acknowledges that Treasury and the IRS are not constrained by those elements and that any transaction that involves (a) a seller "transfer[ing] property to an intermediary for an installment obligation," (b) an intermediary selling the property to another party for "cash or other property," and (c) the seller subsequently receiving "a loan for which the cash or property from the buyer serves *indirectly* as collateral," (emphasis added) is a tax avoidance transaction that will trigger reporting requirements.

79.    Congress, however, has already promulgated detailed rules explaining when transactions do not qualify for the "installment method" of tax accounting. Receipt of loan

---

[2] This purported "justification" is essentially the Treasury's and the IRS's justification described in Paragraph 76(a) above dressed up in different language.

proceeds that are *indirectly* secured (a concept not defined or explained in the Notice or by any other statutory or regulatory guidance) by cash proceeds is not one of them.

80.     Specifically, Congress enacted the Pledge Rule to clarify that when a taxpayer receives a loan that is "secured by" an installment obligation, "the net proceeds of the [loan] shall be treated as payment received on such installment obligation" upon the later of the loan becoming secured or when the taxpayer receives the loan proceeds.  26 U.S.C. § 453A(d)(1).  Congress clarified through statutory text that a loan is "secured by" an installment obligation to the extent that "payment of principal or interest on such indebtedness is *directly* secured (*under the terms of the [loan] or any underlying arrangements*) by an interest in such installment obligation." 26 U.S.C. § 453A (emphasis added).

81.     By enacting the Pledge Rule, Congress unequivocally determined that only the receipt of loan proceeds that are *directly* secured by an installment obligation shall be treated as the receipt of taxable income.  Congress could have more broadly defined when the receipt of loan proceeds is an income-recognition event, but it did not.  It chose to limit narrowly the applicability of the Pledge Rule to situations involving *direct* and explicit collateralization and to not extend immediate income recognition to situations involving so-called "indirect" security.

*The Notice Improperly Pulls Transactions that are*
<u>*Explicitly Permitted by Statute and Regulation into its Ambit*</u>

82.     The Notice improperly pulls within its scope certain transactions that Congress (and Treasury by separate regulations) clearly intended to allow.

83.     For example, in a "like-kind exchange" transaction under 26 U.S.C. § 1031, it is not atypical for a qualified intermediary to purchase or take possession of a property from a seller before selling the property to a pre-determined third-party buyer.

COMPLAINT - 21

84.     The qualified intermediary receives the sales proceeds, which it places into escrow, and then is tasked with finding replacement property that it can tender to the seller. Oftentimes, the statutory period for identifying and purchasing a "like kind" property spans more than one tax year.

85.     If the qualified intermediary does not identify "like kind" replacement property within a statutorily defined period, the intermediary will deliver the funds it received from the buyer to the seller. This often occurs in a tax year subsequent to the year the property was sold to the buyer.

86.     In 1994, in Treasury Decision 8535, Treasury published final regulations under 26 U.S.C. § 1031 titled "Like-kind Exchanges of Property – Coordination with Section 453." Under those rules, Treasury recognized that "in the case of a taxpayer's transfer of relinquished property involving a qualified intermediary, the determination of whether the taxpayer has received a payment for purposes of section 453 … is made as if the qualified intermediary is not the agent of the taxpayer." These regulations are published under 26 C.F.R. § 1.1031(k)-1.

87.     The regulations promulgated under Treasury Decision 8535 and the examples provided thereunder, establish that when a seller engages an intermediary to take possession of a property, sell the property to a buyer, and attempt to locate "like-kind" property to be delivered to the seller, the seller will not be considered in receipt of income for tax-reporting purposes when the buyer pays the intermediary and the intermediary places the sales proceeds into an escrow account for the benefit of the seller.

88.     This tax outcome is conditioned on the seller not receiving rights to "receive, pledge, borrow, or otherwise obtain the benefits of the cash deposited in the escrow account until

the earlier of the date of replacement property is delivered to seller or the end of the exchange period." 26 C.F.R. § 1.031(k)-1(j)(2) (Example 1).

89.   Under the above-described regulations, Treasury explicitly permits sellers to utilize the "installment method" of tax reporting under this situation notwithstanding that (1) an intermediary was involved in the transaction and (2) that the intermediary possibly "indirectly" secured its obligation to the seller through the use of cash deposited into a qualified escrow account.

90.   The Treasury regulations under Section 1031 instead make clear that the determinative factor in considering whether the seller may utilize the "installment method" is whether the seller is expressly limited from receiving, pledging, borrowing, or otherwise obtaining the benefits of the money held in escrow until sometime after the year the property was sold.

91.   There may be a situation where a "like kind exchange" seller takes out a loan in the year the property is sold, but before the intermediary either delivers "like kind" property or relinquishes the sales proceeds at the conclusion of the "like kind exchange" period.  Under this scenario, the loan may come from the very financial institution that maintains the escrow account where the intermediary holds the property's sales proceeds (a possible form of so-called "indirect" security).

92.   The seller's receipt of loan proceeds is not an income-recognition event, as the funds in the escrow account are not directly pledged to the financial institution as collateral for the loan.  The seller in this situation does not "obtain the benefits" of the money held in escrow, as the loan proceeds are separate and distinct, and are derivative of a separate loan agreement between the seller and lender that requires the seller to repay the principal plus periodic interest.

93.     While this arrangement is expressly permitted under 26 C.F.R. § 1.1031(k)-1, the Notice purports to deem it an abusive tax avoidance transaction.

*The Purported Justifications for Listing*
*So-Called MIS Transactions Are Not Grounded in Fact or the Law*

94.     The Notice's assertion that the intermediary in a so-called MIS Transaction is not a "bona fide purchaser" of the property is not grounded in fact or law.

95.     The phrase "bona fide purchaser" is typically used to describe a party "who has in good faith paid valuable consideration for property without notice of prior adverse claims." PURCHASER, Black's Law Dictionary (11th ed. 2019).

96.     Under the so-called MIS Transactions described in the Notice, the intermediary exchanges an installment agreement – which is a financial instrument of value – for the property. Moreover, the Notice does not describe the intermediary as having notice of prior adverse claims against the property.

97.     Treasury and the IRS's assertion that the intermediary's participation in the transaction serves "no purpose other than Federal income tax avoidance" is similarly not grounded in fact or law.

98.     In a so-called MIS Transaction, the intermediary tenders an installment agreement to the seller and takes equitable title to the property, adding new and separate legal and economic consequences to the purchase and sale of the property for the involved parties.

99.     No separate business purpose, apart from the business purpose to sell an asset, is necessary for a taxpayer-seller to choose to sell the asset in an installment sale transaction rather than in a cash sale transaction.

100.    Every installment seller to SCCC has a substantial non-tax purpose for entering into the installment transaction, and that substantial non-tax purpose is to sell an asset.  No

COMPLAINT - 24

additional non-tax purpose is required as a reason for the seller's choosing to sell the asset in an installment-sale transaction rather than in a cash sale.

101.    The economic position of every installment seller to SCCC changes in a meaningful way (apart from Federal income tax effects) because of the sale of the asset that is involved in the installment transaction.

102.    Nevertheless, examples of separate legal and economic consequences for a seller who chooses to engage in an MIS Transaction versus a direct cash sale to a buyer include:

(a) Investment in a fixed income arrangement, whereby interest is paid to the seller each month for a set number of years pursuant to the terms of the installment agreement;

(b) The obligation to pay interest on any loan that it takes out from a third-party lender;

(c) Additional risk that the purported intermediary will default on the installment obligation;

(d) If necessary, the ability to seek to discharge any debt owed to the third-party lender in bankruptcy while maintaining the right to receive interest and principal payments from the purported intermediary pursuant to the installment agreement;

(e) The ability to use an installment obligation to structure estate and asset succession affairs; and

(f) The ability and incentive to favor long-term over short-term investment horizons.

103.    The transactions also create legal and economic consequences for the intermediary, including access to cash from the subsequent buyer, the ability to exercise investment discretion over the sales proceeds, the obligation to pay interest and principal on the

COMPLAINT - 25

installment obligation as they become due to the seller, and the ability to favor long-term over short-term investment horizons.

104.   The codified "economic substance" rules, the "substance over form doctrine," the "step transaction doctrine," and the "conduit theory" are not relevant or applicable to transactions that are subject to specific preferential tax treatment under the Code.  Congress can provide for tax preference items that permissibly delay income recognition, like the installment method of accounting, and Treasury and the IRS cannot disallow this favorable tax treatment just because they do not like those provisions.  That is not how the various "anti-abuse" doctrines cited in the Notice may be applied.

105.   Even if the codified economic substance rules, substance over form doctrine, step transaction doctrine, or conduit theory were relevant to MIS Transactions, a substantive application of those statutory and judicial doctrines and theories fails based on the tangible legal and economic consequences, separate and apart from tax consequences, that flow to and from the parties of an MIS Transaction, as noted above.

106.   While the Notice labels so-called MIS Transactions as tax avoidance strategies, it fails to acknowledge that the interest paid by the purported intermediary to the seller while the installment obligation is outstanding will be *taxable* income to the seller.

107.   Moreover, when the installment obligation matures and the principal is paid, the seller will be required to pay tax on its capital gains under the "installment method."  The so-called MIS Transaction does not avoid tax; it defers tax.  There is nothing nefarious about this Congressionally-sanctioned arrangement.  Indeed, the Code is replete with statutory and regulatory schemes that expressly and legally allow for the deferral of taxes on income under a variety of different situations.

108.     Treasury and the IRS's reliance on 26 C.F.R. § 15a.453-1(b)(3) for the argument that the installment obligation is "indirectly secured by the [property's] sales proceeds," and that the seller should be treated as immediately receiving full payment from the subsequent buyer upon receipt of the installment obligation, is neither a correct description of the law nor is it consistent with the specific elements of an MIS Transaction as described in the Notice itself.

109.     First, the regulation cited by Treasury and the IRS is no longer valid – it is a *temporary* regulation that was promulgated in 1981 and last amended in 1994.  Pursuant to 26 U.S.C. § 7805(e)(2), temporary regulations "shall expire within 3 years after the date of issuance of such regulation."  Accordingly, even if this regulation supported the government's position, which it does not, it has expired and has no force of law.

110.     Moreover, the Notice is at odds with the plain language of 26 C.F.R. § 15a.453-1(b)(3), which states that "'payment' does not include the receipt of evidences of indebtedness of the person acquiring the property ('installment obligation'), *whether or not payment of such indebtedness is guaranteed by a third party*." (Emphasis added).  This regulation is derivative of 26 U.S.C. § 453(f)(3), which provides that the seller's receipt of an installment instrument is not a "payment" that causes immediate income recognition, even when "such indebtedness is guaranteed by another person."  Congress understood that an installment note may be guaranteed or secured and expressly stated that when the obligation is guaranteed, this guarantee does not preclude the seller's use of the "installment method."

111.     Most importantly, in the so-called MIS Transaction described by the Notice, there is no cash or cash equivalent that directly or indirectly secures the installment obligation.  Rather, as stated in the Notice, the cash received by the purported intermediary in a so-called MIS Transaction is "provided to the purported lender to *fund* the purported loan to the seller or

transferred to an escrow or investment account of which the purported lender is a beneficiary." (Emphasis added). Under the Notice's own description of the transaction, the cash tendered by the buyer is provided to the lender to fund the loan; it is not placed into an account to indirectly secure the installment obligation. The government's argument that MIS Transactions run afoul of the Code is at direct odds with its own definition of an MIS Transaction.

112. Similarly, the position that the loan between the third-party lender and the seller is not "bona fide" is a sweeping factual statement for which the IRS provides no support.

113. A "bona fide debt is a debt which arises under a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed or determinable sum of money." *Kean v. Comm'r*, 91 T.C. 575 (1988).

114. Nowhere does the notice allege that the loan agreements between sellers and third-party lenders fail to meet these requirements.

115. Finally, the Notice's reliance on the Pledge Rule as a "justification" for listing so-called MIS Transactions is misguided. As discussed above, the Pledge Rule acts to cause sellers to immediately recognize sales proceeds when the seller takes out a loan and the installment obligation is *directly* pledged to the lender, used for collateral for the loan, or can be relinquished by the seller to the lender to satisfy its obligations under the loan agreement. It does not operate to cause the immediate recognition of income upon the seller's receipt of loan proceeds that are so-called "indirectly" secured by the installment obligation.

### The Notice Breeds Unacceptable Compliance Uncertainty

116. The Notice's description of MIS and "substantially similar" transactions is impermissibly vague.

117.    Taxpayers are entitled to a level of certainty so as to determine whether their conduct is sanctionable before it is sanctioned.  The Notice does not provide that base level of certainty.

118.    While purporting to define an MIS Transaction via seven distinct elements, the Notice nonetheless states that if there is a sale of property to an intermediary who provides the seller with an installment obligation, and if the seller takes out a loan that is "indirectly secured" by the installment obligation, the transaction is reportable as a "substantially similar" transaction.

119.    "Substantially similar" is defined by regulation as "any transaction that is expected to obtain the same or similar types of tax consequences and that is either factually similar or based on the same or similar tax strategy" as the transaction identified in the listing notice.  26 C.F.R. § 1.6011-4(c)(4).

120.    The Notice's definition of a transaction that is "substantially similar" is materially different from the definition of "substantially similar" contained in 26 C.F.R. § 1.6011-4(c)(4).  Congress did not provide the Treasury and the IRS with express authority to promulgate an alternative definition of "substantially similar" specific to MIS Transactions.  The expansive designation of a "substantially similar" transaction used in the Notice fails to provide taxpayers with a measurable standard by which they can assess whether their conduct is reportable.

121.    For instance, the Notice provides no definition of the phrase "serves indirectly as collateral."  Indeed, there is no such thing as "indirect" security; either a loan is secured with collateral, or it is not.

122.    Similarly, the Notice's example of a "substantially similar" transaction would require a seller to report participation in a "listed transaction" even if the seller elects out of the installment method pursuant to 26 U.S.C. § 453(d).  The result of this election would lead to "tax

consequences" that are nothing like those flowing from a transaction that strictly adheres to the seven elements identified in the Notice. Yet, pursuant to the plain language of the Notice, that seller would still be required to report this transaction as a "listed transaction," notwithstanding that the seller has not engaged in a similar tax strategy to an MIS Transaction participant. This hypothetical seller would not be deemed to have engaged in a "substantially similar" transaction under 26 C.F.R. § 1.6011-4(c)(4), but would fall under the Notice's impermissibly broad interpretation of that term.

123.   Moreover, the Notice states that "even if the transaction does not include all of the elements" of the transactions identified in the Notice, the IRS reserves the right to nonetheless deem a transaction as "substantially similar" and thus reportable. The Notice does not state, which, if any, of the purported "elements" are required for a transaction to be deemed "substantially similar." By utilizing this language, the IRS is attempting to give itself unfettered discretion to assess noncompliance penalties against taxpayers who arguably did not engage in an MIS Transaction, but who the IRS later deems to have participated in a so-called "substantially similar" arrangement.

124.   The Notice, in tandem with other Treasury regulations concerning "listed transactions," also fosters unacceptable procedural uncertainty as to which tax periods "participants" and "material advisors" are required to file disclosures.

125.   The Notice, citing 26 C.F.R. § 1.6011-4(e)(2)(i) (one of the Retroactive Reporting Regulations), states that "if a transaction becomes a listed transaction after the filing of a taxpayer's tax return reflecting the taxpayer's participation in the listed transaction and before the end of the period of limitations for assessment for any taxable year in which the taxpayer

participated in the listed transaction, then a disclosure statement must be filed with OTSA within

90 calendar days after the date on which the transaction becomes a listed transaction."

126.    As an initial matter, this regulatory scheme is impermissibly retroactive in that

it imposes rules affecting "taxable period[s] ending before" the date the Notice was published, in

violation of Section 7805(b)(1) (a prohibition that extends to temporary, proposed, and final

regulations).

127.    Moreover, whether a "period of limitations for assessment" of tax remains open

is a facts-and-circumstances question that is preliminarily decided by the IRS under its

examination discretion.

128.    The statute of limitations for assessment of tax is found under 26 U.S.C.

§ 6501(a), and generally provides that tax "shall be assessed within 3 years after the return as

filed."   However, Section 6501 is replete with exceptions to this general rule.   26 U.S.C.

§ 6501(c)(1) (no statute of limitations), (c)(2) (no statute of limitations), (e) (six-year statute of

limitations).

129.    The filing requirement framework contained in the Notice and 26 C.F.R.

§ 1.6011-4(e)(2)(i) for tax years that ended prior to the Notice's promulgation is unworkable.  Will

the IRS provide its view on whether participation in such transactions causes the statute of

limitations on assessment to remain open indefinitely?  Will taxpayers be penalized for failure to

file disclosure statements for tax years that they thought, in good faith, were closed to additional

assessment?  Will the IRS permit taxpayers to argue reasonable cause and lack of willful neglect

to avoid penalties for failure to file disclosure statements for periods they reasonably believed were

closed, notwithstanding that Section 6707A does not contain a "reasonable cause" or "good faith"

exception?

130.     Indeed, in Tax Court matters, the IRS has argued that income taxes stemming from MIS Transactions that occurred in years where the statute of limitations on assessment have otherwise closed can still be assessed in a later tax year pursuant to Section 481, which permits the IRS to make "adjustments" to taxable income if there is a "change" in the taxpayer's method of accounting between one year and the next.   What effect, if any, does the IRS's Section 481 argument have on the requirement that taxpayers report participation in an MIS Transaction for a tax year where the "period of limitations" for assessment is open?

131.     These questions highlight the vagueness problems inherent in tying a filing obligation to an oftentimes indeterminable, amorphous, and fluctuating standard like the statute of limitations on tax assessment.

132.     Similarly, the Notice creates unworkable uncertainty for taxpayers attempting to determine if they "participated" in an MIS Transaction for any given year.   By regulation, a taxpayer is deemed to have "participated in a listed transaction if the taxpayer's tax return reflects tax consequences or a tax strategy described" in the listing notice.  26 C.F.R. § 1.6011-4(c)(3)(A).  However, what constitutes a "tax consequence" or "strategy," is undefined by statute, regulation, or the Notice.

133.     In an MIS Transaction, the seller receives an installment obligation that pays periodic interest.  Will a seller be deemed to participate in an MIS Transaction for a particular tax year just because he or she receives an interest payment?   Is the receipt of interest a "tax consequence" or the result of a "tax strategy?"   Will the purported intermediary be deemed to "participate" in a "listed transaction" if it deducts the interest that it pays to sellers?   What if it pays the interest but does not deduct these payments from its gross receipts for income tax computation purposes?

134.     The Notice leaves these and many other questions unanswered forcing taxpayers to either expend resources filing protective disclosures for every possible event that could be considered "participation" by the IRS or take the chance that the IRS will later deem certain events to be reportable.

### The Notice Places Potentially Impossible Burdens on Taxpayers

135.     The Notice purports to impose reporting obligations on MIS Transaction "participants," even when a so-called "participant" cannot know that they participated in such a transaction.

136.     As described above, the Notice provides elements of the transaction that are strictly between the "seller" and the "intermediary," as well as elements that involve arrangements solely between the "seller" and the "lender."

137.     There exists a real possibility that the intermediary knows nothing about the loan arrangement between the "seller" and the "lender," yet the "intermediary" would be required to report its participation in the so-called MIS Transaction, nonetheless.  The "intermediary" may not even know that the "seller" arranged to take out a loan.

138.     Similarly, a "lender" may provide a loan to a "seller" without any notice of the installment obligation or without knowledge that the installment obligation somehow "indirectly secures" the loan.

139.     It is unlikely that the "intermediary" or the "lender" will be privy to the seller's tax return to know whether it "treats the purported installment sale as an installment sale under section 453," one of the elements of a so-called MIS Transaction.  Tax return information is confidential, and there is no requirement that a seller share how it treats a transaction on its tax return with other parties who are purported "participants" to that transaction.

140.     Accordingly, the Notice has the potential to require taxpayers to disclose their participation in transactions to which they do not know they are "participants."  Treasury and the IRS cannot impose affirmative duties on taxpayers where compliance is impossible.

*Effects of Notice on Plaintiffs*

141.     While stylized as a "notice of proposed rulemaking and notice of public hearing," the Notice nonetheless represents final agency action on certain issues that has caused Plaintiffs to suffer immediate and damaging harm.

142.     The Notice achieves Treasury and the IRS's final goal of discouraging taxpayer participation in transactions that could be categorized as so-called MIS or "substantially similar" transactions, effectively freezing SCCC's business.

143.     Indeed, SCCC's business has effectively ceased following publication of the Notice.

144.     The Notice represents Treasury's and the IRS's longstanding, final, and cumulative interpretive position that transactions falling within its definition of so-called MIS and "substantially similar" transactions are not permitted under the Code and the Treasury's associated regulations.

145.     As stated previously, in the Notice and a separate public pronouncement described above, Treasury and the IRS maintain that they have the authority to identify a "listed transaction" through public notice and subregulatory guidance without soliciting, considering, and responding to comments from the public.

146.     Importantly, beyond boilerplate language regarding the submission and consideration of all comments, the Notice affirmatively seeks comments on only one discrete issue – "whether the buyer of the gain property should be treated as a participant given the buyer's key role in the transaction."  Although SCCC, as a qualified intermediary, is treated as buyer and

reseller under existing Treasury regulations cited above, Plaintiffs are not the "buyers" in the so-called MIS Transactions described by the Notice.  SCCC is an "intermediary" under the terms of the Notice.

147.    By not affirmatively and specifically soliciting comments on other elements of the self-styled "proposed" regulations, and by giving lip service to the APA's notice-and-comment process, Treasury and the IRS have loudly signaled that the Notice contains their final interpretive position that "the seller, the intermediary, and the purported lender" in so-called MIS Transactions operate to assist the seller avoid tax.  Treasury and the IRS's final interpretive position regarding so-called MIS Transactions is consistent with the IRS's CCA Memorandum and "Dirty Dozen" press releases, described above.

148.    While the Notice by its plain terms does not currently oblige Plaintiffs to file "participant" or "material advisor" disclosure statements, from a practical perspective, it requires Plaintiffs to presently expend resources collecting, organizing, and analyzing the information necessary to (a) determine whether they will be subject to disclosure requirements upon an expected publication of a "final" regulation, and if so (b) prepare to comply with those disclosure requirements.  Failure to do so could subject Plaintiffs to severe penalties, including criminal sanctions.  It is the IRS's position that taxpayers cannot seek prepayment judicial review of such penalties.  Rather, taxpayers can either expend their resources preparing protective information returns, or otherwise wait to see whether the IRS will penalize them, pay crippling penalties for alleged noncompliance, and then sue for a refund.

149.    Plaintiffs' practical need to utilize present resources to scrutinize disclosure and recordkeeping requirements; seek and pay for professional compliance advice; and otherwise prepare for Treasury and the IRS to issue formal regulations identifying so-called MIS

Transactions as "listed transactions" is hastened by Treasury regulations that require "listed transaction" disclosure statements for "participants" to be filed within "90 calendar days after the date on which the transaction became a listed transaction," and "material advisor" disclosure statements to be filed by the last day of the month following the close of the calendar quarter when the transaction becomes "listed."

150.    These onerous deadlines for filing these disclosure statements are compounded by the requirements in the Retroactive Reporting Regulations that "listed transaction" "participants" go back in time, determine which of their prior tax periods may still be open for assessment (without any guidance on what if any limitations may apply), and then file disclosure statements for open tax periods that preceded the listing notice.

151.    Notwithstanding the Notice's description of the elements of what the Notice regards as a covered monetized installment sale transaction, in at least two instances since the publication of the Notice, the IRS has declared to the U.S. Tax Court that the IRS does not understand SCCC's transactions.  If notwithstanding the Notice, the IRS does not understand SCCC's transactions, the burden and risk for SCCC of compliance with the Notice is impermissibly indefinite and unlimited.

## CAUSES OF ACTION

### Count One: Injunctive and Declaratory Relief Under 5 U.S.C. § 702 Setting Aside and Declaring the Notice Unlawful as Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law

152.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 151, above.

153.    The Notice is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

COMPLAINT - 36

154.    By enacting 26 U.S.C. §§ 453 and 453A, Congress created a statutory regime that allows and encourages taxpayers to report dispositions of properties using the "installment method" of tax accounting when a property's sale involves at least one payment that will (or may) be paid in a year subsequent to the year of disposition.  That is exactly what so-called MIS Transactions do – sellers sell their properties, and, in return, they receive installment obligations that provide for cash payments in future tax years.  By enacting these statutes, Congress not only permitted the use of the "installment method," it made the "installment method" the *default* method of tax accounting for "installment sales."  The "installment method" is essentially a preference treatment promulgated by Congress to allow taxpayers to defer recognition of income until they receive cash payments.

155.    By labeling so-called MIS Transactions as tax avoidance maneuvers in spite of the IRS' declared lack of understanding of the transactions, the Notice is not in accordance with the plain statutory text and intent of 26 U.S.C. §§ 453 and 453A.

156.    For the reasons stated in this complaint, and other reasons to be established at trial, Plaintiffs are entitled to a court order pursuant to 5 U.S.C. §§ 702 and 706(2)(A) setting aside and holding the Notice unlawful, as it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

### Count Two: Injunctive and Declaratory Relief Under 5 U.S.C. § 702 Setting Aside and Declaring the Notice Unlawful as Contrary to a Constitutional Right, Power, Privilege, or Immunity

157.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 151, above.

158.    The Notice is contrary to taxpayers' rights under the due process clause of the Fifth Amendment of the United States Constitution, as it is impermissibly vague and, in certain instances, could impose impossible reporting obligations on taxpayers.

159.    When a statutory or regulatory regime leads to penal consequences, as is this case here given the punitive effect of 26 U.S.C. §§ 6707, 6707A, and 7203 for reporting noncompliance, a law will be considered unconstitutionally vague when it "fails to give ordinary people fair notice of the conduct it punishes," or "invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591 (2015).

160.    Even when a statute or regulation is not part of a penal regime, a law is unconstitutionally vague if it is indefinite to the point that it provides no discernable rules or standards. *See, e.g., Boutilier v. INS*, 387 U.S. 118 (1967).

161.    While the Notice purports to specify the elements of an MIS Transaction, immediately after listing those elements it states that a "transaction may be 'substantially similar' to the transaction described above even if the transaction does not include all of the elements described above."

162.    By asserting that transaction may be "substantially similar" to a so-called MIS Transaction, and thus subject to "listed transaction" reporting requirements," but then failing to state what elements, if any, are required for a transaction to be "substantially similar," the Notice is impermissibly vague.

163.    In light of the IRS' declared lack of understanding of SCCC's transactions, the Treasury and the IRS are unable to determine whether SCCC's transactions are "substantially similar" to the transaction elements stated in the Notice.

164.    Moreover, the Notice working in tandem with the Retroactive Reporting Regulations, imposes an impermissibly vague mandate concerning the tax periods for which MIS Transaction "participants" must file disclosures.  Taxpayers must be able to determine, with certainty, which tax years require the filing of disclosures.

COMPLAINT - 38

165.    Similarly, the elements of a so-called MIS Transaction involve different discrete transactions between separate subsets of "participants" who may or may not know about the activities of other so-called "participants" to the transaction.  When a law imposes affirmative mandates, like disclosure requirements, it is impermissibly vague if a regulated party cannot readily determine that it has such an obligation.

166.    For the reasons stated in this complaint, and other reasons to be established at trial, Plaintiffs are entitled to a court order pursuant to 5 U.S.C. §§ 702 and 706(2)(B) setting aside and holding that the Notice violates taxpayers' due process rights under the Fifth Amendment of the United States Constitution.

### Count Three: Injunctive and Declaratory Relief Under 5 U.S.C. § 702 Setting Aside and Declaring the Notice Unlawful as in Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right

167.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 151, above.

168.    In issuing the Notice, Treasury and the IRS exceeded their statutory authority to promulgate a regulation identifying "listed transactions."

169.    Section 6707A defines a "listed transaction" as a "reportable transaction which is the same as, or substantially similar to, a transaction *specifically identified* by the Secretary as a *tax avoidance transaction* for purposes of 6011."  (Emphasis added).

170.    As discussed above, the Notice does not *specifically identify* the elements of the subject "listed transaction."  Rather, it identifies purported elements of an MIS Transaction, but then carves out broad authority for Treasury and the IRS to designate a transaction as "substantially similar" "even if such transaction does not include" all of the elements described in the Notice. By failing to tailor the Notice to a *specific* set of elements, Treasury and the IRS exceeded their statutory authority to identify a "listed transaction" under 26 U.S.C. § 6707A.

171.    Similarly, "listed transactions," defined by 26 U.S.C. § 6707A, are limited to "tax avoidance transactions."  So-called MIS Transactions are not "tax avoidance" transactions; rather, their effect is to *defer* the payment of federal income taxes on capital gains, not the avoidance of payment altogether.  Congress did not delegate Treasury with the authority to designate deferral transactions as "listed transactions."

172.    Tax avoidance is not the same thing as tax deferral.  The common definition of the term "avoidance" is the "act of evading or escaping." AVOIDANCE, Black's Law Dictionary (11th ed. 2019).  Separately, the "deferral of taxes" is the "postponement of paying a tax from one year to another."  DEFERRAL OF TAXES, Black's Law Dictionary (11th ed. 2019).

173.    Under a so-called MIS Transaction, the seller does not avoid the payment of taxes.  Rather, the seller receives payment on the installment obligation principal in a later tax year.  Under the "installment method" of tax accounting, taxes on capital gains are not eliminated; rather, they are deferred from the year of the property's disposition to a later tax year when the seller receives cash proceeds or other property.

174.    For the reasons stated in this complaint, and other reasons to be established at trial, Plaintiffs are entitled to a court order pursuant to 5 U.S.C. §§ 702 and 706(2)(C) setting aside and holding that the Notice exceeds Treasury and the IRS's statutory authorization to designate "listed transactions" pursuant to 26 U.S.C. §§ 6011 and 6707A.

***Count Four: Injunctive and Declaratory Relief Under***
***5 U.S.C. § 702 Setting Aside and Declaring the Retroactive Reporting Regulations as in***
***Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right***

175.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 151, above.

176.    The Retroactive Reporting Regulations, 26 C.F.R. §§ 1.6011-4(e)(2)(i), 301.6111-3(b)(4)(iii), and 301.6111-3(e), operating in tandem with Defendant's procedures for

designating "listed transactions," violate 26 U.S.C. § 7805(b), which states that "[e]xcept as otherwise provided in this subsection no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before … [t]he date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public."

177.   Whenever the Treasury designates a transaction as a "listed transaction," participants are required pursuant to the Retroactive Reporting Regulations to file Forms 8886 for all tax years where (1) the taxpayer participated in the "listed transaction," and (2) where the statute of limitations on assessment against the taxpayer participant remains open.

178.   Similarly, when the Treasury designates a "listed transaction," "material advisors" are required to file a disclosure statement using Form 8918 with the OTSA "by the last day of the month that follows the end of the calendar quarter in which the advisor becomes a material advisor." 26 C.F.R. § 301.6111-3(e).  Treasury regulations do not deem a party to be a "material advisor" for only those transactions that post-date the listing notice; rather, the regulations state that a party becomes a material advisor based on prior activity as of the listing notice's publishing date.  These *post hoc* "material advisors" are then required to file disclosure statements for pre-notice transactions.

179.   The Retroactive Reporting Regulations do not provide a date backstop to the "material advisor" disclosure requirements, and theoretically, a so-called "material advisor" could be required to file disclosures for transactions that it facilitated decades prior to the Notice.

180.   The Notice attempts to plug this gap by stating that "material advisors would be required to disclose only if they have made a tax statement on or after [the date that is 6 years before the date that the Final Regulations are published in the Federal Register]."  However, even

this stopgap violates 26 U.S.C. § 7805(b), which does not allow for Treasury regulations to apply to "any taxable period ending" prior to a proposed, temporary, or final regulation's publication.

181.    The Retroactive Reporting Regulations requirement that "participants" and "material advisors" file information returns for tax periods preceding a regulatory notice is a direct violation of Section 7805(b).

182.    None of the exceptions enumerated in 26 U.S.C. § 7805(b)(2)-(7) applies to the Retroactive Reporting Regulations, operating in tandem with the Treasury's procedures for designating "listed transactions," to allow the Treasury to promulgate retroactive regulations.

183.    For the reasons stated in this complaint, and other reasons to be established at trial, Plaintiffs are entitled to a court order pursuant to 5 U.S.C. §§ 702 and 706(2)(C) setting aside and holding that the Retroactive Reporting Regulations, operating in tandem with its procedures for identifying "listed transactions," exceed Treasury and the IRS's statutory to issue regulations under 26 U.S.C. § 7805.

### *Count Five: Declaratory Relief Under*
### *28 U.S.C. § 2201 for an Order that Plaintiffs are not Required to File Disclosures*
### *for Tax Periods Ending Before the Notice's Publication*

184.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 151, above.

185.    If the court does not grant the relief sought in Counts 1 through 4, above, the Court should enter an order that provides narrower relief declaring that Plaintiffs are not required to prepare and submit "participant" or "material advisor" disclosure statements (Forms 8886 and 8918, respectively) for tax periods that ended before the Notice's publication.

186.    As stated above, the Retroactive Reporting Regulations, working in tandem with the Treasury's procedures for identifying listed transactions, require "participants" and "material advisors" to file disclosures relating to activities from tax periods that predate the

publication of a notice describing the expected contents of any proposed regulation.  These obligations cause the Retroactive Reporting Regulations to violate 26 U.S.C. § 7805(b), which explicitly prohibits regulations that impose duties on taxpayers for tax periods that predate regulatory notice.

187.    Once a transaction officially becomes "listed," "participants" only have 90 days to file disclosures for prior tax years.  "Material advisors" only have until the "last day of the month" after the close of the calendar quarter when a transaction becomes "listed" to file disclosures.  If a transaction becomes "listed" on June 30th, a "material advisor" would be required to file disclosures by July 31st.

188.    In anticipation of MIS Transactions officially becoming "listed," Plaintiffs are currently suffering harm in the form of time and expenses they are required to spend scrutinizing disclosure and recordkeeping requirements; seeking professional compliance advice; and organizing information in preparation for disclosures relating to activities that predate the Notice.

189.    Plaintiffs should not be required to engage in these activities, as the regulatory scheme underpinning disclosures covering pre-Notice tax periods is unlawful pursuant to 26 U.S.C. § 7805(b).

190.    Accordingly, Plaintiffs are presently entitled to a court order declaring that they are not required to file disclosures relating to transactions that predate the Notice.  Such an order would rightfully relieve Plaintiffs from some of the current and ongoing harms that they are experiencing.

191.    For the reasons stated in this complaint, and other reasons to be established at trial, Plaintiffs are entitled to a court order pursuant to 28 U.S.C. §§ 2201(a) that declares that they

are not required to submit "participant" and "material advisor" disclosures pursuant to 26 C.F.R.

§§ 1.6011-4 and 301.6111-3 for tax periods that ended prior to the Notice's publication.

### Count Six: Injunctive and Declaratory Relief Under
### 5 U.S.C. § 702 Prohibiting the Adoption of Regulations Pursuant to the Notice Until After
### Treasury Promulgates Regulations Pursuant to 26 U.S.C. § 453A(e)

192.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1

through 151, above.

193.    To the extent the Court determines that the Notice should not be set aside and

held unlawful, the Court should alternatively issue an order prohibiting Treasury from issuing final

regulations contemplated by the Notice until after Treasury promulgates regulations under 26

U.S.C. § 453A.

194.    The Court should also issue an order mandating Treasury to issue final

regulations to fulfill its duty to do so as provided in 26 U.S.C. § 453A.

195.    Plaintiffs continue to suffer immediate and continuing harm due to Treasury

and the IRS's issuance of the Notice.  As described above, the Notice has effectively chilled their

business dealings under threat of onerous disclosure requirements and potential penalties,

notwithstanding the IRS' declared lack of understanding of SCCC's transactions.

196.    Treasury has frequently failed to issue final regulations that it is responsible for

promulgating.  This has led to the issue of "spurned delegations" of regulatory authority and

"phantom regulations" promulgated by courts.  *15 W. 17th St. LLC v. Comm'r,* 147 T.C. 557

(2016).

197.    Indeed, more than three decades ago, pursuant to 26 U.S.C. § 453A(e),

Congress directed Treasury to promulgate regulations concerning when the "installment method"

should be disallowed for abuse of Section 453A through "the use of related persons, pass-thru

entities, or intermediaries."  It has yet to issue regulations pursuant to this mandate.

198.    Instead of issuing needed guidance under Section 453A(e), Treasury has instead decided to utilize its resources to improperly designate so-called MIS Transactions as "listed transactions," notwithstanding that such transactions otherwise comply with current statutes and regulations, as described above, and notwithstanding the IRS' declared lack of understanding of SCCC's transactions.

199.    To the extent the Court declines to set aside the Notice and hold it unlawful, it is imperative that Treasury be prohibited from finalizing the regulations contemplated by the Notice until after Treasury provides definitive regulatory guidance as to when the use of intermediaries is permissible in an "installment sale."  Absent such an order, Plaintiffs will be left in a state of limbo where the IRS has designated so-called MIS Transactions as abusive, but where Plaintiffs have no judicial recourse to challenge the IRS's designation.

200.    For the reasons stated in this complaint, and other reasons to be established at trial, to the extent the Notice is not set aside or held unlawful, Plaintiffs are entitled to a court order pursuant to 5 U.S.C. §§ 702 and 706(1) mandating that Treasury finalize regulations pursuant to Congress's directive under 26 U.S.C. § 453A(e) and prohibiting Treasury from adopting regulations contemplated by the Notice until after Treasury finalizes those Section 453A regulations.

### Count Seven: Injunctive and Declaratory Relief Under
### 28 U.S.C. § 1361 Prohibiting the Adoption of Regulations Pursuant to the Notice Until After Treasury Promulgates Regulations Pursuant to 26 U.S.C. § 453A(e)

201.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 151, above.

202.    For the reasons described in Count 6, above, to the extent the Court determines that the Notice should not be set aside and held unlawful, Treasury owes a duty to Plaintiffs to suspend issuance of any final regulations contemplated by the Notice until after Treasury

promulgates regulations pursuant to 26 U.S.C. § 453A.  For the reasons stated in this complaint, and other reasons to be established at trial, to the extent the Notice is not set aside or held unlawful, Plaintiffs are entitled to a court order pursuant to 28 U.S.C. § 1361 mandating that Treasury finalize regulations pursuant to Congress's directive under 26 U.S.C. § 453A(e) and prohibiting Treasury from adopting regulations contemplated by the Notice until after Treasury finalizes those Section 453A regulations.

### Count Eight: Injunctive and Declaratory Relief Under 5 U.S.C. § 702 Setting Aside and Declaring 26 C.F.R. §§ 1.6011-4 and 301.6111-3 Unlawful as Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law

203.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 151, above.

204.    The APA prescribes a three-step procedure for notice-and-comment rulemaking.  One of those steps requires that the agency must consider and respond to significant comments received from the public during the period for public comment.  The agency must incorporate a concise and general statement of the rule's basis and purpose.   Such statements "must enable the reviewing court to see the objections and why the agency reacted to them as it did as one of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions … and rebut vital relevant or significant comments." *Hewitt v. Comm'r*, 21 F.4th 1336, 1342-43 (11th Cir. 2021) (internal punctuation and citations omitted).

205.    Public comments were made in response to the proposed regulations that ultimately were finalized as 26 C.F.R. §§ 1.6011-4 and 301.6111-3.

206.    Those comments were "significant" such that they required a response from Treasury.

COMPLAINT - 46

207.    Treasury failed to adequately respond to those significant comments in the final regulations' "basis and purpose" statement, in violation of the APA's procedural requirements.

208.    For the reasons stated above, 26 C.F.R. §§ 1.6011-4 and 301.6111-3 are unlawful and should be set aside pursuant to 5 U.S.C. §§ 702 and 706(2), either generally or in regard to Plaintiffs.

209.    This cause of action accrued upon publication of the Notice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.   Judgment that the Notice issued by Treasury and the IRS is unlawful and shall be set aside pursuant to 5 U.S.C. §§ 702 and 706(2);

2.   Judgment that the 26 C.F.R. §§ 1.6011-4(e)(2)(i), 301.6111-3(b)(4)(iii), and 301.6111-3(e), operating in tandem with Defendant's procedures for designating "listed transactions," are unlawful and shall be set aside pursuant to 5 U.S.C. §§ 702 and 706(2), either generally or in regard to Plaintiffs;

3.   Alternatively, judgment pursuant to 28 U.S.C. § 2201(a) declaring that Plaintiffs are not required to submit "participant" or "material advisor" disclosures pursuant to 26 C.F.R. §§ 1.6011-4 and 301.6111-3 for tax periods that ended prior to the Notice's publication;

4.   Alternatively, judgment that Treasury shall promulgate regulations pursuant to 26 U.S.C. § 453A without undue delay pursuant to 5 U.S.C. §§ 702 and 706(1) and that Treasury is prohibited from issuing final regulations contemplated by the Notice until after Treasury promulgates those Section 453A regulations;

5.   Alternatively, judgment that Treasury shall promulgate regulations pursuant to 26 U.S.C. § 453A without undue delay pursuant to 28 U.S.C. § 1361 and that Treasury is prohibited

from issuing final regulations contemplated by the Notice until after Treasury promulgates those Section 453A regulations;

6.    Alternatively, judgment that 26 C.F.R. §§ 1.6011-4 and 301.6111-3 are unlawful and should be set aside pursuant to 5 U.S.C. §§ 702 and 706(2), either generally or in regard to Plaintiffs.

7.    An award of reasonable attorneys fees and costs pursuant to 28 U.S.C. § 2412;

8.    Such other and further relief as the Court deems proper and just.

DATED this 1st day of August, 2024.

KIRTON McCONKIE

_/s/ Haley K. Krug_
Haley K. Krug
*Attorney for Plaintiffs*

COMPLAINT - 48

EXHIBIT A

not meet the requirements in this section. We will notify you and the proposed representative if we do not recognize the person as your representative.

■ 12. Revise § 416.1507 to read as follows:

**§ 416.1507   Appointing a representative.**

We will recognize a person as your representative if:

(a) You and your representative complete and sign our prescribed appointment form, and

(b) You or your representative file our prescribed appointment form in the manner we designate.

■ 13. In § 416.1520, add new paragraph (f) to read as follows:

**§ 416.1520   Fee for a representative's services.**

\*   \*   \*   \*   \*

(f) *Assignment of fees.* A representative who is eligible for direct payment of an authorized fee may assign the authorized fee to an entity that is eligible for direct payment of fees (see 416.1530(e) and 416.1535).

■ 14. In § 416.1530, revise the heading of paragraph (b), revise paragraph (b)(1), and add a new paragraph (e) to read as follows:

**§ 416.1530   Payment of Fees.**

\*   \*   \*   \*   \*

(b) *Fees we may pay.* (1) *Attorneys and eligible non-attorneys.* Except as provided in paragraph (c) of this section, if we make a determination or decision in your favor and you were represented by an attorney or an eligible non-attorney (see 416.1517), and as a result of the determination or decision you have past-due benefits,

(i) We will pay your representative out of the past-due benefits the lesser of the amounts in paragraph (b)(1)(iii) or (iv) of this section, less the amount of the assessment described in paragraph (d) of this section, unless the representative submits to us in writing a waiver of the fee or direct payment of the fee, and

(ii) If there is a valid assignment (see paragraph (e) of this section), we will pay the representative's fee (see paragraph (b)(1)(i) of this section) to an entity.

\*   \*   \*   \*   \*

(e) *Assignment of a fee to designated entity* (1) A representative may assign the fee we authorize to an eligible entity if the representative:

(i) Is eligible for direct payment,

(ii) Has not waived the fee or direct payment,

(iii) Assigns the entire fee we authorize to one entity,

(iv) Makes the assignment before the date on which we notify you of our first favorable determination or decision, and

(v) Affiliates with the entity through registration.

(2) A representative may rescind an assignment before the date on which we notify you of our first favorable determination or decision.

(3) A representative may not assign a fee to an entity that is ineligible to receive direct payment.

(4) A representative may not waive a fee or direct payment of a fee if the representative previously assigned a fee in accordance with paragraph (e)(1) of this section and did not timely rescind that assignment in accordance with paragraph (e)(2) of this section.

■ 15. Add § 416.1535 to read as follows:

**§ 416.1535   Entity eligible for direct payment of fees.**

An entity is eligible for direct payment of an authorized fee if the entity:

(a) Has an Employer Identification Number

(b) Has registered with us in the manner we prescribe,

(c) Has not been found ineligible for direct payment,

(d) Designates and maintains an employee who is a registered representative as a point of contact to speak and act on the entity's behalf,

(e) Accepts payment via electronic funds transfer, and

Conforms to our rules.

■ 16. In § 416.1540, add a new paragraph (c)(15) to read as follows:

**§ 416.1540   Rules of conduct and standards of responsibility for representatives.**

\*   \*   \*   \*   \*

(c) \*   \*   \*

(15) While serving as a point of contact for an entity, violate applicable affirmative duties, engage in prohibited actions, or conduct dealings with us in a manner that is untruthful or does not further the efficient and prompt correction of a fee error.

**PART 422—ORGANIZATION AND PROCEDURES**

**Subpart F—Applications and Related Forms**

■ 17. The authority citation for subpart F of part 422 is revised to read as follows:

**Authority:** 42 U.S.C. 1320b–10(a)(2)(A).

■ 18. In § 422.515, revise the designation of form SSA–1696 to read as follows:

**§ 422.515   Forms used for withdrawal, reconsideration and other appeals, and appointment of representative.**

\*   \*   \*   \*   \*

SSA–1696—Claimant's Appointment of Representative. (For use by claimants or representatives as a notice of their appointment of a representative in a claim, issue, or other matter that is pending a determination or a decision before the agency).

\*   \*   \*   \*   \*

[FR Doc. 2023–16405 Filed 8–3–23; 8:45 am]

**BILLING CODE 4191–02–P**

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 1**

**[REG–109348–22]**

**RIN 1545–BQ69**

**Identification of Monetized Installment Sale Transactions as Listed Transactions**

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Notice of proposed rulemaking and notice of public hearing.

---

**SUMMARY:** This document contains proposed regulations that would identify monetized installment sale transactions and substantially similar transactions as listed transactions, a type of reportable transaction. Material advisors and participants in these listed transactions would be required to file disclosures with the IRS and would be subject to penalties for failure to disclose. The proposed regulations would affect participants in those transactions as well as material advisors. This document also provides a notice of a public hearing on the proposed regulations.

**DATES:**

*Comments:* Electronic or written comments must be received by October 3, 2023.

*Public Hearing:* The public hearing is scheduled to be held on October 12, 2023, at 10:00 a.m. ET. Pursuant to Announcement 2023–16, 2023–20 I.R.B. 854 (May 15, 2023), the public hearing is scheduled to be conducted in person, but the IRS will provide a telephonic option for individuals who wish to attend or testify at the hearing by telephone. Requests to speak and outlines of topics to be discussed at the

public hearing must be received by October 3, 2023. If no outlines are received by October 3, 2023, the public hearing will be cancelled. Requests to attend the public hearing must be received by 5:00 p.m. ET on October 10, 2023. The hearing will be made accessible to people with disabilities. Requests for special assistance during the hearing must be received by 5:00 p.m. ET on October 6, 2023.

**ADDRESSES:** Commenters are strongly encouraged to submit public comments electronically. Submit electronic submissions via the Federal eRulemaking Portal at *https://www.regulations.gov* (indicate IRS and REG–109348–22) by following the online instructions for submitting comments. Requests for a public hearing must be submitted as prescribed in the "Comments and Requests for a Public Hearing" section. Once submitted to the Federal eRulemaking Portal, comments cannot be edited or withdrawn. The Department of the Treasury (Treasury Department) and the IRS will publish for public availability any comments to the IRS's public docket. Send paper submissions to: CC:PA:LPD:PR (REG–109348–22), Room 5203, Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Washington, DC 20044.

**FOR FURTHER INFORMATION CONTACT:** Concerning the proposed regulations, Jonathan A. Dunlap of the Office of Associate Chief Counsel (Income Tax and Accounting), (202) 317–4718 (not a toll-free number); concerning submissions of comments and requests for hearing, Vivian Hayes at (202) 317–5306 (not a toll-free number) or *publichearings@irs.gov* (preferred).

**SUPPLEMENTARY INFORMATION:**

## Background

This document contains proposed additions to 26 CFR part 1 (Income Tax Regulations) under section 6011 of the Internal Revenue Code (Code). The additions identify certain transactions as "listed transactions" for purposes of section 6011.

## I. Disclosure of Reportable Transactions by Participants and Penalties for Failure To Disclose

Section 6011(a) generally provides that, when required by regulations prescribed by the Secretary of the Treasury or her delegate (Secretary), "any person made liable for any tax imposed by this title, or with respect to the collection thereof, shall make a return or statement according to the forms and regulations prescribed by the Secretary. Every person required to

make a return or statement shall include therein the information required by such forms or regulations."

Section 1.6011–4(a) provides that every taxpayer that has participated in a reportable transaction within the meaning of § 1.6011–4(b) and who is required to file a tax return must file a disclosure statement within the time prescribed in § 1.6011–4(e).

Reportable transactions are identified in § 1.6011–4 and include listed transactions, confidential transactions, transactions with contractual protection, loss transactions, and transactions of interest. *See* § 1.6011–4(b)(2) through (6). Section 1.6011–4(b)(2) defines a listed transaction as a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction.

Section 1.6011–4(c)(4) provides that a transaction is "substantially similar" if it is expected to obtain the same or similar types of tax consequences and is either factually similar or based on the same or similar tax strategy. Receipt of an opinion regarding the tax consequences of the transaction is not relevant to the determination of whether the transaction is the same as or substantially similar to another transaction. Further, the term substantially similar must be broadly construed in favor of disclosure. For example, a transaction may be substantially similar to a listed transaction even though it may involve different entities or use different Code provisions.

Section 1.6011–4(c)(3)(i)(A) provides that a taxpayer has participated in a listed transaction if the taxpayer's tax return reflects tax consequences or a tax strategy described in the published guidance that lists the transaction under § 1.6011–4(b)(2). Published guidance may identify other types or classes of persons that will be treated as participants in a listed transaction. Published guidance may also identify types or classes of persons that will not be treated as participants in a listed transaction.

Section 1.6011–4(d) and (e) provide that the disclosure statement Form 8886, *Reportable Transaction Disclosure Statement* (or successor form) must be attached to the taxpayer's tax return for each taxable year for which a taxpayer participates in a reportable transaction. A copy of the disclosure statement must be sent to the IRS's Office of Tax Shelter Analysis (OTSA) at the same time that any disclosure statement is first filed by

the taxpayer pertaining to a particular reportable transaction.

Section 1.6011–4(e)(2)(i) provides that if a transaction becomes a listed transaction after the filing of a taxpayer's tax return reflecting the taxpayer's participation in the listed transaction and before the end of the period of limitations for assessment for any taxable year in which the taxpayer participated in the listed transaction, then a disclosure statement must be filed with OTSA within 90 calendar days after the date on which the transaction becomes a listed transaction. This requirement extends to an amended return and exists regardless of whether the taxpayer participated in the transaction in the year the transaction became a listed transaction. The Commissioner of Internal Revenue (Commissioner) may also determine the time for disclosure of listed transactions in the published guidance identifying the transaction.

Participants required to disclose these transactions under § 1.6011–4 who fail to do so are subject to penalties under section 6707A. Section 6707A(b) provides that the amount of the penalty is 75 percent of the decrease in tax shown on the return as a result of the reportable transaction (or which would have resulted from such transaction if such transaction were respected for Federal tax purposes), subject to minimum and maximum penalty amounts. The minimum penalty amount is $5,000 in the case of a natural person and $10,000 in any other case. For a listed transaction, the maximum penalty amount is $100,000 in the case of a natural person and $200,000 in any other case.

Additional penalties may also apply. In general, section 6662A imposes a 20 percent accuracy-related penalty on any understatement (as defined in section 6662A(b)(1)) attributable to an adequately disclosed reportable transaction. If the taxpayer had a requirement to disclose participation in the reportable transaction but did not adequately disclose the transaction in accordance with the regulations under section 6011, the taxpayer is subject to an increased penalty rate equal to 30 percent of the understatement. *See* section 6662A(c). Section 6662A(b)(2) provides that section 6662A applies to any item which is attributable to any listed transaction and any reportable transaction (other than a listed transaction) if a significant purpose of such transaction is the avoidance or evasion of Federal income tax.

Participants required to disclose listed transactions who fail to do so are also subject to an extended period of

limitations under section 6501(c)(10). That section provides that the time for assessment of any tax with respect to the transaction shall not expire before the date that is one year after the earlier of the date the participant discloses the transaction or the date a material advisor discloses the participation pursuant to a written request under section 6112(b)(1)(A).

## II. Disclosure of Reportable Transactions by Material Advisors and Penalties for Failure To Disclose

Section 6111(a) provides that each material advisor with respect to any reportable transaction shall make a return setting forth: (1) information identifying and describing the transaction, (2) information describing any potential tax benefits expected to result from the transaction, and (3) such other information as the Secretary may prescribe. Such return shall be filed not later than the date specified by the Secretary.

Section 301.6111–3(a) of the Procedure and Administration Regulations provides that each material advisor with respect to any reportable transaction, as defined in § 1.6011–4(b), must file a return as described in § 301.6111–3(d) by the date described in § 301.6111–3(e).

Section 301.6111–3(b)(1) provides that a person is a material advisor with respect to a transaction if the person provides any material aid, assistance, or advice with respect to organizing, managing, promoting, selling, implementing, insuring, or carrying out any reportable transaction, and directly or indirectly derives gross income in excess of the threshold amount as defined in § 301.6111–3(b)(3) for the material aid, assistance, or advice. Under § 301.6111–3(b)(2)(i) and (ii), a person provides material aid, assistance, or advice if the person provides a tax statement, which is any statement (including another person's statement), oral or written, that relates to a tax aspect of a transaction that causes the transaction to be a reportable transaction as defined in § 1.6011–4(b)(2) through (7).

Material advisors must disclose transactions on Form 8918, *Material Advisor Disclosure Statement* (or successor form), as provided in § 301.6111–3(d) and (e). Section 301.6111–3(e) provides that the material advisor's disclosure statement for a reportable transaction must be filed with the OTSA by the last day of the month that follows the end of the calendar quarter in which the advisor becomes a material advisor with respect to a reportable transaction or in which

the circumstances necessitating an amended disclosure statement occur. The disclosure statement must be sent to the OTSA at the address provided in the instructions for Form 8918 (or successor form).

Section 301.6111–3(d)(2) provides that the IRS will issue to a material advisor a reportable transaction number with respect to the disclosed reportable transaction. Receipt of a reportable transaction number does not indicate that the disclosure statement is complete, nor does it indicate that the transaction has been reviewed, examined, or approved by the IRS. Material advisors must provide the reportable transaction number to all taxpayers and material advisors for whom the material advisor acts as a material advisor as defined in § 301.6111–3(b). The reportable transaction number must be provided at the time the transaction is entered into, or, if the transaction is entered into prior to the material advisor receiving the reportable transaction number, within 60 calendar days from the date the reportable transaction number is mailed to the material advisor.

Section 6707(a) provides that a material advisor who fails to file a timely disclosure, or files an incomplete or false disclosure statement, is subject to a penalty. Pursuant to section 6707(b)(2), for listed transactions, the penalty is the greater of (1) $200,000, or (2) 50 percent of the gross income derived by such person with respect to aid, assistance, or advice which is provided with respect to the listed transaction before the date the return is filed under section 6111.

Additionally, section 6112(a) provides that each material advisor with respect to any reportable transaction shall (whether or not required to file a return under section 6111 with respect to such transaction) maintain a list (1) identifying each person with respect to whom such advisor acted as a material advisor with respect to such transaction and (2) containing such other information as the Secretary may by regulations require. Material advisors must furnish such lists to the IRS in accordance with § 301.6112–1(e).

A material advisor may be subject to a penalty under section 6708 for failing to maintain a list under section 6112 and failing to make the list available upon written request to the Secretary in accordance with section 6112(b) within 20 business days after the date of such request. Section 6708(a) provides that the penalty is $10,000 per day for each day of the failure after the 20th day. However, no penalty will be imposed with respect to the failure on any day

if such failure is due to reasonable cause.

## III. Installment Sales

Section 61(a)(3) provides that a taxpayer's gross income includes gains from dealings in property. Under section 1001(a), a taxpayer's gain on a sale of property is equal to the excess of the amount realized on the sale over the taxpayer's adjusted basis in the property and, generally, a taxpayer must recognize the gain in the taxable year of the sale. The taxpayer's amount realized generally includes cash actually or constructively received, plus the fair market value of any property received or, in the case of a debt instrument issued in exchange for property, the issue price of the debt instrument. *See* § 1.1001–1 of the Income Tax Regulations.

Section 453 provides an exception to the general rule that gain from the sale of property must be recognized in the year of sale. Section 453(a) provides, in general, that income from an installment sale is accounted for under the installment method. Under section 453(b), an installment sale is one in which a taxpayer disposes of property and at least one payment is to be received after the close of the taxable year of the disposition. The installment method, as described in section 453(c), requires a taxpayer to recognize income from a disposition as payments are actually or constructively received, in an amount equal to the proportion of the payment received that the gross profit (realized or to be realized when payment is completed) bears to the total contract price.

Under section 453(f)(3) and 26 CFR 15a.453–1(b)(3) (Temporary Income Tax Regulations Under the Installment Sales Revision Act), a taxpayer generally does not receive a "payment," as such term is used in section 453(b), to the extent the taxpayer receives evidence of indebtedness "of the person acquiring the property" (installment obligation). As a result, notwithstanding that a taxpayer has received an installment obligation from the buyer evidencing the buyer's obligation to pay an amount equal to the purchase price, the taxpayer is not treated as having received full payment in the year in which the taxpayer received the installment obligation. Instead, the taxpayer is treated as receiving payments when the taxpayer receives (or constructively receives) payments under the installment obligation.

However, to the extent that the taxpayer receives a note or other evidence of indebtedness in the year of sale from a person other than "the

person acquiring the property,'' section 453(f)(3) is inapplicable. A note or other evidence of indebtedness received in the year of sale issued by a person other than the person acquiring the property is, under § 15a.453–1(b)(3), the receipt of a payment for purposes of section 453. Likewise, under § 15a.453–1(b)(3), the taxpayer's receipt of a note or other evidence of indebtedness that is secured directly or indirectly by cash or a cash equivalent is treated as the receipt of payment for purposes of section 453.

Section 453A(d) provides rules relating to certain installment obligations arising from a disposition of property, the sales price of which is more than $150,000. Under section 453A(d), if any indebtedness is secured by an installment obligation to which section 453A applies, the net proceeds of the secured indebtedness are treated as a payment received on the installment obligation as of the later of the time the indebtedness becomes secured by the installment obligation or the time the taxpayer receives the proceeds of the indebtedness (the pledging rule). To the extent installment payments are received after the date payment is treated as received under section 453A(d), the tax on such payments is treated as having already been paid.

### IV. Tax Avoidance Using Monetized Installment Sales

The Treasury Department and the IRS are aware that promoters are marketing transactions that purport to convert a cash sale of appreciated property by a taxpayer (seller) to an identified buyer (buyer) into an installment sale to an intermediary (who may be the promoter) followed by a sale from the intermediary to the buyer. In a typical transaction, the intermediary issues a note or other evidence of indebtedness to the seller requiring annual interest payments and a balloon payment of principal at the maturity of the note, and then immediately or shortly thereafter, the intermediary transfers the seller's property to the buyer in a purported sale of the property for cash, completing the prearranged sale of the property by seller to buyer. In connection with the transaction, the promoter refers the seller to a third party that enters into a purported loan agreement with the seller. The intermediary generally transfers the amount it has received from the buyer, less certain fees, to an account held by or for the benefit of this third party (the account). The third party provides a purported non-recourse loan to the seller in an amount equal to the amount the seller would have received from the buyer for the sale of

the property, less certain fees. The ''loan'' is either funded or collateralized by the amount deposited into the account. The seller's obligation to make payments on the purported loan is typically limited to the amount to be received by the seller from the intermediary pursuant to the purported installment obligation. Upon maturity of the purported installment obligation, the purported loan, and the funding note, the offsetting instruments each terminate, giving rise to a deemed payment on the purported installment obligation and triggering taxable gain to the seller purportedly deferred until that time.

The promotional materials for these transactions assert that engaging in the transaction will allow the seller to defer the gain on the sale of the property under section 453 until the taxpayer receives the balloon principal payment in the year the note matures, even though the seller receives cash from the purported lender in an amount that approximates the amount paid by the buyer to the intermediary. The IRS intends to use multiple arguments to challenge the reported treatment of these transactions as installment sales to which section 453 purportedly applies, including the arguments described below.

First, the intermediary is not a bona fide purchaser of the gain property that is the subject of the purported installment sale. In these transactions, the intermediary is interposed between the seller and the buyer for no purpose other than Federal income tax avoidance, and the intermediary neither enjoys the benefits nor bears the burdens of ownership of the gain property. The interposition of the intermediary typically takes place after the seller has decided to sell the gain property to a specific buyer at a specific negotiated purchase price, and the purported resale by the intermediary to such buyer generally takes place almost simultaneously with the purported sale to the intermediary for approximately the same negotiated purchase price, less certain fees. The seller's only purpose for entering into an agreement with the intermediary is to defer recognition of the gain on the sale of the gain property to the buyer. Other than the Federal income tax deferral benefits provided by the installment method provisions of section 453, the sole economic effect of entering the monetized installment sale transaction from the perspective of the seller is to pay direct and indirect fees to the intermediary and the purported lender in an amount that is substantially less than the Federal tax savings purportedly achieved from using section

453 to defer the realized gain on the sale.

When an intermediate transaction with a third party is interposed and lacks independent substantive (non-tax) purpose, such transaction is not respected for Federal income tax purposes and the transaction is appropriately treated as a sale of the property by the seller directly to the buyer in the taxable year in which the gain property is transferred by the seller. *See Commissioner* v. *Court Holding Co.,* 324 U.S. 331, 334 (1945) (''A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress'' (footnote omitted); *Wrenn* v. *Commissioner,* 67 T.C. 576 (1976), (holding that a taxpayer did not engage in a bona fide installment sale when the taxpayer transferred stock to his spouse under a purported installment sale contract, followed by the spouse immediately selling the stock to a third party for a negligible gain); *Blueberry Land Co.* v. *Commissioner,* 361 F.2d 93, 100 (5th Cir. 1966), (holding that a corporation's transaction with an unrelated intermediary entered into solely to avoid Federal income taxes on the sale should be disregarded for Federal income tax purposes and the corporation should be taxed as if it sold the property directly to the ultimate buyer); *Enbridge Energy Co. Inc.* v. *United States,* 354 F. App'x 15 (5th Cir. 2009) (holding that an intermediate sale was a sham, the intermediary lacked a ''bona fide role in the transaction,'' as its only purpose for being a party in the transaction, and indeed for existing, was to mitigate the Federal tax bill arising from the transaction, and that the transaction should be treated, for Federal tax purposes, as a sale directly from the seller to the taxpayer).

In addition, it is inappropriate to treat the intermediary in the monetized installment sale transaction described in this NPRM as the acquirer of the gain property that is the subject of the purported installment sale because the intermediary neither enjoys the benefits nor bears the burdens of ownership of the gain property that a person must possess to be considered the owner of property for Federal income tax purposes. *See Grodt & McKay Realty Inc.* v. *Commissioner,* 77 T.C. 1221 (1981). *See also Derr* v. *Commissioner,* 77 T.C. 708 (1981) and *Baird* v. *Commissioner,* 68 T.C. 115 (1977).

Second, in these transactions the seller is appropriately treated as having already received the full payment at the time of the sale to the buyer because (1) the purported installment obligation received by the seller is treated as the receipt of a payment by the seller under § 15a.453–1(b)(3) since it is indirectly secured by the sales proceeds, or (2) the proceeds of the purported loan are appropriately treated as a payment to the seller because the purported loan is not a bona fide loan for Federal income tax purposes, or (3) the pledging rule of section 453A(d) deems the seller to receive full payment on the purported installment obligation in the year the seller receives the loan proceeds.

Third, the transaction may be disregarded or recharacterized under the economic substance rules codified under section 7701(o) or the substance over form doctrine. The step transaction doctrine and conduit theory may also apply to recharacterize monetized installment sale transactions described in this NPRM.

*V. Purpose of Proposed Regulations*

On March 3, 2022, the Sixth Circuit issued an order in *Mann Construction* v. *United States,* 27 F.4th 1138, 1147 (6th Cir. 2022), holding that Notice 2007–83, 2007–2 C.B. 960, which identified certain trust arrangements claiming to be welfare benefit funds and involving cash value life insurance policies as listed transactions, violated the Administrative Procedure Act (APA), 5 U.S.C. 551–559, because the notice was issued without following the notice-and-comment procedures required by section 553 of the APA. The Sixth Circuit reversed the decision of the district court, which held that Congress had authorized the IRS to identify listed transactions without notice and comment. See *Mann Construction, Inc.* v. *United States,* 539 F.Supp.3d 745, 763 (E.D. Mich. 2021).

Relying on the Sixth Circuit's analysis in *Mann Construction,* three district courts and the Tax Court have concluded that IRS notices identifying listed transactions were improperly issued because they were issued without following the APA's notice and comment procedures. See *Green Rock, LLC* v. *IRS,* 2023 WL 1478444 (N.D. AL., February 2, 2023) (Notice 2017–10); *GBX Associates, LLC,* v. *United States,* 1:22cv401 (N.D. Ohio, Nov. 14, 2022) (same); *Green Valley Investors, LLC, et al.* v. *Commissioner,* 159 T.C. No. 5 (Nov. 9, 2022) (same); see also *CIC Services, LLC* v. *IRS,* 2022 WL 985619 (E.D. Tenn. March 21, 2022), as modified by 2022 WL 2078036 (E.D.

Tenn. June 2, 2022) (Notice 2016–66, identifying a transaction of interest).

The Treasury Department and the IRS disagree with the Sixth Circuit's decision in *Mann Construction* and the subsequent decisions that have applied that reasoning to find other IRS notices invalid and are continuing to defend the validity of notices identifying transactions as listed transactions in circuits other than the Sixth Circuit. At the same time, however, to avoid any confusion and ensure consistent enforcement of the tax laws throughout the nation, the Treasury Department and the IRS are issuing these proposed regulations to identify monetized installment sale transactions as listed transactions for purposes of all relevant provisions of the Code and Treasury Regulations.

**Explanation of Provisions**

These proposed regulations would require taxpayers that participate in monetized installment sale transactions and substantially similar transactions, and persons who act as material advisors with respect to these transactions, to disclose the transactions in accordance with the regulations issued under sections 6011 and 6111. Material advisors would also be required to maintain lists as required by section 6112.

*I. Definition of Monetized Installment Sale Transaction*

Proposed § 1.6011–13(a) would provide that a transaction that is the same as, or substantially similar to, a monetized installment sale transaction described in proposed § 1.6011–13(b) is a listed transaction for purposes of § 1.6011–4(b)(2) and sections 6111 and 6112. "Substantially similar" is defined in § 1.6011–4(c)(4) to include any transaction that is expected to obtain the same or similar types of tax consequences and that is either factually similar or based on the same or a similar tax strategy.

The transaction described in proposed § 1.6011–13(b) includes the following elements:

(1) A taxpayer (seller), or a person acting on the seller's behalf, identifies a potential buyer for appreciated property (gain property), who is willing to purchase the gain property for cash or other property (buyer cash).

(2) The seller enters into an agreement to sell the gain property to a person other than the buyer (intermediary) in exchange for an installment obligation.

(3) The seller purportedly transfers the gain property to the intermediary, although the intermediary either never takes title to the gain property or takes

title only briefly before transferring it to the buyer.

(4) The intermediary purportedly transfers the gain property to the buyer in a sale of the gain property in exchange for the buyer cash.

(5) The seller obtains a loan, the terms of which are such that the amount of the intermediary's purported interest payments on the installment obligation correspond to the amount of the seller's purported interest payments on the loan during the period. On each of the installment obligation and loan, only interest is due over identical periods, with balloon payments of all or a substantial portion of principal due at or near the end of the instruments' terms.

(6) The sales proceeds from the buyer received by the intermediary, reduced by certain fees (including an amount set aside to fund purported interest payments on the purported installment obligation), are provided to the purported lender to fund the purported loan to the seller or transferred to an escrow or investment account of which the purported lender is a beneficiary. The lender agrees to repay these amounts to the intermediary over the course of the term of the installment obligation.

(7) On the seller's Federal income tax return for the taxable year of the purported installment sale, the seller treats the purported installment sale as an installment sale under section 453.

A transaction may be "substantially similar" to the transaction described above even if such transaction does not include all of the elements described above. For example, a transaction would be substantially similar to a monetized installment sale if a seller transfers property to an intermediary for an installment obligation, the intermediary simultaneously or after a brief period transfers the property to a previously identified buyer for cash or other property, and in connection with the transaction, the seller receives a loan for which the cash or property from the buyer serves indirectly as collateral.

*II. Participation*

Whether a taxpayer has participated in the listed transaction described in proposed § 1.6011–13(b) would be determined under § 1.6011–4(c)(3)(i)(A). Participants would include the seller, the intermediary, the purported lender, and any other person whose Federal income tax return reflects tax consequences or the tax strategy described in proposed § 1.6011–13(b), or a substantially similar transaction.

Under the proposed regulations, the buyer of the gain property that provides the buyer cash or other consideration

would not be treated as a participant in the listed transaction described in proposed § 1.6011–13(b) under § 1.6011–4(c)(3)(i)(A). The Treasury Department and the IRS request comments on whether the buyer of the gain property should be treated as a participant given the buyer's key role in the transaction. If the final regulations include the buyer as a participant, that change would apply only with respect to transactions entered into after the date on which the final regulations are published in the **Federal Register**.

*III. Material Advisors*

Material advisors who make a tax statement with respect to monetized installment sale transactions described in proposed § 1.6011–13(b) would have disclosure and list maintenance obligations under sections 6111 and 6112. *See* §§ 301.6111–3 and 301.6112–1.

*IV. Effect of Transaction Becoming a Listed Transaction*

Participants required to disclose listed transactions under § 1.6011–4 who fail to do so are subject to penalties under section 6707A. Participants required to disclose listed transactions under § 1.6011–4 who fail to do so are also subject to an extended period of limitations under section 6501(c)(10). Material advisors required to disclose listed transactions under section 6111 who fail to do so are subject to penalties under section 6707. Material advisors required to maintain lists of investors under section 6112 who fail to do so (or who fail to provide such lists when requested by the IRS) are subject to penalties under section 6708. In addition, the IRS may impose other penalties on persons involved in listed transactions, including accuracy-related penalties under section 6662 or section 6662A, the section 6694 penalty for understatements of a taxpayer's liability by a tax return preparer, the section 6700 penalty for promoting abusive tax shelters, and the section 6701 penalty for aiding and abetting understatement of tax liability.

The Treasury Department and IRS recognize that some taxpayers may have filed Federal income tax returns taking the position that they were entitled to the purported tax benefits of the type of transactions described in these proposed regulations. Because the IRS will take the position in litigation that taxpayers are not entitled to the purported tax benefits of transactions described in these proposed regulations, taxpayers who have participated in those transactions should consider the best way to make corrections, whether

by filing an amended return, an administrative adjustment request under section 6227, or a Form 3115, *Application for Change in Accounting Method* (whichever is applicable), or if the taxpayer has been contacted by the IRS for examination for a taxable year in which the taxpayer participated in the transaction, by working with an IRS employee to reverse the purported tax benefits.

In addition, the proposed regulations would subject material advisors to disclosure requirements with regard to transactions occurring in prior years. However, notwithstanding § 301.6111–3(b)(4)(i) and (iii), material advisors would be required to disclose only if they have made a tax statement on or after [the date that is 6 years before the date that Final Regulations are published in the **Federal Register**].

*V. Applicability Date*

Proposed § 1.6011–13(a) would identify monetized installment sale transactions, and transactions that are the same as, or substantially similar to, the monetized installment sale transactions described in proposed § 1.6011–13(b) as listed transactions effective as of the date of publication in the **Federal Register** of a Treasury decision adopting these regulations as final regulations.

**Special Analyses**

*I. Paperwork Reduction Act*

The collection of information contained in these proposed regulations is reflected in the collection of information for Forms 8886 and 8918 that have been reviewed and approved by the Office of Management and Budget (OMB) in accordance with the Paperwork Reduction Act (44 U.S.C. 3507(c)) under control numbers 1545–1800 and 1545–0865.

To the extent there is a change in burden as a result of these regulations, the change in burden will be reflected in the updated burden estimates for the Forms 8886 and 8918. The requirement to maintain records to substantiate information on Forms 8886 and 8918 is already contained in the burden associated with the control number for the forms and remains unchanged.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid OMB control number.

*II. Regulatory Flexibility Act*

The Secretary of the Treasury hereby certifies that the proposed regulations will not have a significant economic

impact on a substantial number of small entities pursuant to the Regulatory Flexibility Act (5 U.S.C. chapter 6). This certification is based on the fact that these proposed regulations implement sections 6111 and 6112 and § 1.6011–4 by specifying the manner in which and time at which an identified Monetized Installment Sale Transaction must be reported.

Further, the Treasury Department and the IRS expect that the reporting burden is low; the information sought is necessary for regular annual return preparation and ordinary recordkeeping. The estimated burden for any taxpayer required to file Form 8886 is approximately 10 hours, 16 minutes for recordkeeping, 4 hours, 50 minutes for learning about the law or the form, and 6 hours, 25 minutes for preparing, copying, assembling, and sending the form to the IRS. According to the American Institute of CPAs 2016 National MAP Survey, the median billing cost for a CPA is approximately $100 per hour. *See* 2016 AICPA PCPS/CPA.com National MAP Survey 8–9 (2016), *https://www.riscpa.org/writable/news-items/documents/2016_pcps_national_map_survey_commentary.pdf* (last accessed July 3, 2023). For 2018, the median billing cost for a CPA is approximately $210.50 per hour. *See* National MAP Survey 2018 Executive Summary, 13 (2018), *https://us.aicpa.org/content/dam/aicpa/interestareas/privatecompaniespracticesection/financialadminoperations/nationalmapsurvey/downloadabledocuments/2018-national-map-survey-executive-summary.pdf* (last accessed July 3, 2023). Thus, for the initial reporting period, it is estimated that taxpayers may incur costs ranging from $2,150 to $4,700 per respondent, although this amount is anticipated to be significantly less for all subsequent reporting periods.

For the reasons stated, a regulatory flexibility analysis under the Regulatory Flexibility Act is not required. The Treasury Department and the IRS invite comments on the impact of the proposed regulations on small entities. Pursuant to section 7805(f) of the Code, this notice of proposed rulemaking has been submitted to the Chief Counsel for the Office of Advocacy of the Small Business Administration for comment on its impact on small business.

*III. Unfunded Mandates Reform Act*

Section 202 of the Unfunded Mandates Reform Act of 1995 (UMRA) requires that agencies assess anticipated costs and benefits and take certain other actions before issuing a final rule that

includes any Federal mandate that may result in expenditures in any one year by a State, local, or Tribal government, in the aggregate, or by the private sector, of $100 million (updated annually for inflation). This proposed rule does not include any Federal mandate that may result in expenditures by State, local, or Tribal governments, or by the private sector in excess of that threshold.

### IV. Executive Order 13132: Federalism

Executive Order 13132 (Federalism) prohibits an agency from publishing any rule that has federalism implications if the rule either imposes substantial, direct compliance costs on State and local governments, and is not required by statute, or preempts State law, unless the agency meets the consultation and funding requirements of section 6 of the Executive order. This proposed rule does not have federalism implications and does not impose substantial direct compliance costs on State and local governments or preempt State law within the meaning of the Executive order.

### V. Regulatory Planning and Review

Pursuant to the Memorandum of Agreement, *Review of Treasury Regulations under Executive Order 12866* (June 9, 2023), tax regulatory actions issued by the IRS are not subject to the requirements of section 6(b) of Executive Order 12866, as amended. Therefore, a regulatory impact assessment is not required.

### Comments and Public Hearing

Before these proposed amendments to the regulations are adopted as final regulations, consideration will be given to any comments that are submitted timely to the IRS as prescribed in the preamble under the **ADDRESSES** section. The Treasury Department and the IRS request comments on all aspects of the proposed regulations. Any comments submitted will be made available at *https://www.regulations.gov* or upon request. Once submitted to the Federal eRulemaking Portal, comments cannot be edited or withdrawn.

A public hearing is being held on October 12, 2023, beginning at 10:00 a.m. ET, in the Auditorium at the Internal Revenue Building, 1111 Constitution Avenue NW, Washington, DC. Due to building security procedures, visitors must enter at the Constitution Avenue entrance. In addition, all visitors must present photo identification to enter the building. Because of access restrictions, visitors will not be admitted beyond the immediate entrance area more than 30 minutes before the hearing starts.

Participants may alternatively attend the public hearing by telephone.

The rules of 26 CFR 601.601(a)(3) apply to the hearing. Persons who wish to present oral comments at the hearing must submit an outline of the topics to be discussed as well as the time to be devoted to each topic by October 3, 2023. A period of ten minutes will be allocated to each person for making comments. After the deadline for receiving outlines has passed, the IRS will prepare an agenda containing the schedule of speakers. Copies of the agenda will be made available free of charge at the hearing. If no outlines of the topics to be discussed at the hearing are received by October 3, 2023, the public hearing will be cancelled. If the public hearing is cancelled, a notice of cancellation of the public hearing will be published in the **Federal Register**.

Individuals who want to testify in person at the public hearing must send an email to *publichearings@irs.gov* to have your name added to the building access list The subject line of the email must contain the regulation number REG–109348–22 and the language TESTIFY In Person. For example, the subject line may say: Request to TESTIFY In Person at Hearing for REG–109348–22.

Individuals who want to testify by telephone at the public hearing must send an email to *publichearings@irs.gov* to receive the telephone number and access code for the hearing. The subject line of the email must contain the regulation number REG–109348–22 and the language TESTIFY Telephonically. For example, the subject line may say: Request to TESTIFY Telephonically at Hearing for REG–109348–22.

Individuals who want to attend the public hearing in person without testifying must also send an email to *publichearings@irs.gov* to have your name added to the building access list. The subject line of the email must contain the regulation number (REG–109348–22) and the language ATTEND In Person. For example, the subject line may say: Request to ATTEND Hearing In Person for REG–109348–22. Requests to attend the public hearing must be received by 5:00 p.m. ET on October 10, 2023.

Individuals who want to attend the public hearing telephonically without testifying must also send an email to *publichearings@irs.gov* to receive the telephone number and access code for the hearing. The subject line of the email must contain the regulation number (REG–109348–22) and the language ATTEND Hearing Telephonically. For example, the subject line may say: Request to

ATTEND Hearing Telephonically for REG–109348–22. Requests to attend the public hearing must be received by 5:00 p.m. ET on October 10, 2023.

Hearings will be made accessible to people with disabilities. To request special assistance during the hearing, contact the Publications and Regulations Branch of the Office of Associate Chief Counsel (Procedure and Administration) by sending an email to *publichearings@irs.gov* (preferred) or by telephone at (202) 317–6901 (not a toll-free number) at least October 6, 2023.

### Statement of Availability of IRS Documents

Guidance cited in this preamble is published in the Internal Revenue Bulletin and is available from the Superintendent of Documents, U.S. Government Publishing Office, Washington, DC 20402, or by visiting the IRS website at *https://www.irs.gov*.

### Drafting Information

The principal author of these proposed regulations is Jonathan A. Dunlap, Office of Associate Chief Counsel (Income Tax & Accounting). However, other personnel from the Treasury Department and the IRS participated in their development.

### List of Subjects in 26 CFR Part 1

Income taxes, Reporting and recordkeeping requirements.

### Proposed Amendments to the Regulations

Accordingly, the Treasury Department and the IRS propose to amend 26 CFR part 1 as follows:

## PART 1—INCOME TAXES

■ **Paragraph 1.**The authority citation for part 1 is amended by adding an entry for § 1.6011–13 in numerical order to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *

* * * * *

Section 1.6011–13 also issued under 26 U.S.C. 6001 and 26 U.S.C. 6011.

* * * * *

■ **Par. 2.** Section 1.6011–13 is added to read as follows:

### § 1.6011–13 Monetized installment sale listed transaction.

(a) *Identification as a listed transaction.* Transactions that are the same as, or substantially similar to, a transaction described in paragraph (b) of this section are identified as listed transactions for purposes of § 1.6011–4(b)(2).

(b) *Monetized installment sale transaction.* A transaction is a

*monetized installment sale transaction* if, in connection with the transaction, and regardless of the order of the steps, or the presence of additional steps or parties—

(1) A taxpayer (seller), or a person acting on the seller's behalf, identifies a potential buyer for appreciated property (gain property), who is willing to purchase the gain property for cash or other property (buyer cash);

(2) The seller enters into an agreement to sell the gain property to a person other than the buyer (intermediary), in exchange for an installment obligation;

(3) The seller purportedly transfers the gain property to the intermediary, although the intermediary either never takes title to the gain property or takes title only briefly before transferring it to the buyer;

(4) The intermediary purportedly transfers the gain property to the buyer in a sale of the gain property in exchange for the buyer cash;

(5) The seller obtains a loan, the terms of which are such that the amount of the intermediary's purported interest payments on the installment obligation correspond to the amount of the seller's purported interest payments on the loan during the period. On each of the installment obligation and loan, only interest is due over identical periods, with balloon payments of all or a substantial portion of principal due at or near the end of the instruments' terms;

(6) The sales proceeds from the buyer received by the intermediary, reduced by certain fees (including an amount set aside to fund purported interest payments on the purported installment obligation), are provided to the purported lender to fund the purported loan to the seller or transferred to an escrow or investment account of which the purported lender is a beneficiary. The lender agrees to repay these amounts to the intermediary over the course of the term of the installment obligation; and

(7) On the seller's Federal income tax return for the taxable year of the purported installment sale, the seller treats the purported installment sale as an installment sale under section 453.

(c) *Substantially similar transactions.* A transaction may be substantially similar to a transaction described in paragraph (b) of this section if the transaction does not include all of the elements described in that paragraph. For example, a transaction would be substantially similar to a monetized installment sale described in paragraph (b) of this section if a seller transfers property to an intermediary for an installment obligation, the intermediary simultaneously or after a brief period transfers the property to a previously identified buyer for cash or other property, and in connection with the transaction, the seller receives a loan for which the cash or property from the buyer serves indirectly as collateral.

(d) *Participation in a monetized installment sale transaction.* Participants in a monetized installment sale transaction described in paragraph (b) of this section include sellers, intermediaries and purported lenders described in paragraph (b) of this section and any other taxpayer whose Federal income tax return reflects tax consequences or the tax strategy described in paragraph (b) of this section or a substantially similar transaction. Buyers of gain property described in paragraph (b) of this section are not treated as participants.

(e) *Applicability date.* This section's identification of transactions that are the same as, or substantially similar to, the transaction described in paragraph (b) of this section as listed transactions for purposes of § 1.6011–4(b)(2) and sections 6111 and 6112 of the Code is effective the date that these regulations are published as final regulations in the **Federal Register**. Notwithstanding section 301.6111–3(b)(4)(i) and (iii) of this chapter, material advisors are required to disclose only if they have made a tax statement on or after the date that is 6 years before the date that these regulations are published as final regulations in the **Federal Register**.

**Douglas W. O'Donnell,**

*Deputy Commissioner for Services and Enforcement.*

[FR Doc. 2023–16650 Filed 8–3–23; 8:45 am]

**BILLING CODE 4830–01–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Part 100**

**[Docket Number USCG–2023–0597]**

**RIN 1625–AA08**

**Special Local Regulations; Recurring Marine Events, Sector St. Petersburg**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Coast Guard proposes to revise existing regulations by updating the duration of an existing event in the Seventh Coast Guard District Captain of the Port (COTP) St. Petersburg Zone. This action is necessary to provide for the safety of life on these navigable waters in Clearwater, FL, during the Clearwater Offshore Nationals/Race World Offshore event. The Coast Guard invites your comments on this proposed rulemaking.

**DATES:** Comments and related material must be received by the Coast Guard on or before September 5, 2023.

**ADDRESSES:** You may submit comments identified by docket number USCG–2023–0597 using the Federal eRulemaking Portal at *https:// www.regulations.gov.* See the "Public Participation and Request for Comments" portion of the **SUPPLEMENTARY INFORMATION** section for further instructions on submitting comments.

**FOR FURTHER INFORMATION CONTACT:** If you have questions about this proposed rulemaking, call or email Marine Science Technician First Class Mara J. Brown, Sector St. Petersburg Prevention Department, Coast Guard; telephone (813) 228–2191 (ext. 8151), email *Mara.J.Brown@uscg.mil.*

**SUPPLEMENTARY INFORMATION:**

**I. Table of Abbreviations**

CFR   Code of Federal Regulations
COTP   Captain of the Port
DHS   Department of Homeland Security
FR   Federal Register
NPRM   Notice of proposed rulemaking
§   Section
U.S.C.   United States Code

**II. Background, Purpose, and Legal Basis**

The Coast Guard proposes to revise the Recurring Marine Events in the geographic boundaries of the Seventh Coast Guard District Captain of the Port (COTP) St. Petersburg Zone that are listed in 33 CFR 100.703, Table 1 to § 100.703. The proposed change is to Line No. 6 located under Date/time, existing as "One Sunday in September; Time (Approximate): 11:30 a.m. to 4 p.m." The event sponsor has changed the duration of the event to a two-day event; revising the Date/time as "One weekend (Saturday and Sunday) in September; Time (Approximate): 8 a.m. to 4 p.m."

The Coast Guard proposes this rulemaking under authority in 46 U.S.C. 70041.

**III. Discussion of Proposed Rule**

This rule proposes to make the following changes in 33 CFR 100.703:

1. Revise Table 1 to § 100.703, Line No. 6, to reflect a date and time change.

Marine events listed in Table 1 to § 100.703 are listed as recurring over a particular time, during each month and each year. Exact dates are intentionally omitted since calendar dates for specific